**UNITED STATES of America,**
**Appellee–Cross–Appellant,**

**v.**

**Melvin Lee DAVIS, Defendant–**
**Appellant–Cross–Appellee.**

**No. 1236, Docket 92–1708.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 13, 1993.

Decided Nov. 3, 1993.

Gary D. Weinberger, Asst. Federal Public Defender for D. Conn., Hartford, CT (Thomas G. Dennis, Federal Public Defender for D. Conn., of counsel), for defendant-appellant.

Thomas J. Murphy, Asst. U.S. Atty. D. Conn., New Haven, CT (Albert S. Dabrowski, U.S. Atty. D. Conn., Anthony E. Kaplan, Asst. U.S. Atty., of counsel), for appellee.

Before: WINTER, MINER and WALKER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Melvin Lee Davis appeals [1] from a judgment of conviction and

---

**1.** On February 10, 1993, a panel of this Court granted the Government's motion to withdraw its cross-appeal.

sentence entered in the United States District Court for the District of Connecticut (Nevas, *J.*), after a bench trial, convicting him of one count of knowingly attempting to escape from the custody of an institutional facility in which he was lawfully confined by the Attorney General of the United States, in violation of 18 U.S.C. § 751 (1988), and two counts of knowingly making or using a false writing or document in a matter within the jurisdiction of a department or agency of the United States, in violation of 18 U.S.C. § 1001 (1988). The district court found that: (1) false writings and statements made by Davis were made in relation to matters within the jurisdiction of the United States Marshals Service and the United States Department of Justice, Bureau of Prisons, both of which are agencies or departments of the United States; (2) a violation of 18 U.S.C. § 1001 does not require that a false statement have been submitted *to* a department or agency of the United States, but only that it be made in a matter within the jurisdiction of such department or agency; and (3) Davis prepared the documents with the objective of either procuring early release or having his security level reduced to one that would enable him to escape from the facility where he was incarcerated. Davis was sentenced to a prison term of forty-one months, to run concurrently with the sentence he was serving at the time of his attempted escape. Davis also was sentenced to a three-year term of supervised release, and was ordered to pay a special assessment of $150. For the reasons that follow, the judgment of conviction is affirmed.

## BACKGROUND

In June of 1981 and January of 1982, Davis was convicted of offenses in the United States District Court for the Eastern District of Virginia and lawfully was committed to the custody of the United States Attorney General. Davis was not scheduled to be released from the Attorney General's custody until October of 2011, at which time he faced an active detainer in the State of Virginia.

On August 24, 1989, Davis was transferred by the Attorney General, acting through the United States Bureau of Prisons, to the custody of the State of Connecticut Department of Corrections ("CDC"), where he was housed as a sentenced federal prisoner at the Connecticut Correctional Institution at Somers, Connecticut ("Somers"). The transfer was made pursuant to a contract between the United States Marshals Service and the CDC. The Bureau of Prisons had the benefit of this contract through an arrangement with the Marshals Service that allowed it to place prisoners within its control into Connecticut correctional institutions.

The contract provided that a sentenced federal prisoner housed in state custody, absent a medical or emergency situation, would be released only to the United States Marshals Service or the agency initially committing the prisoner. In addition to this agreement, pursuant to standard correctional practice, if the Bureau of Prisons requested that a defendant be released to an entity other than the United States Marshals Service, that request would be honored by the Connecticut officials.

Federal prisoners in the custody of the CDC are subject to the rules of the CDC for most purposes. The administrative directive of the CDC regarding federal prisoners provides: "All sentenced federal prisoners shall be subject to all rules and regulations of the Department of Corrections with the exception of good time and the setting of release dates. These two items will remain with Federal Bureau of Prisons' officials."

Until September of 1990, Davis was incarcerated at Somers, where he was an inmate trustee and the law library clerk—positions that provided him with access to typewriters and office supplies. While at Somers, Davis approached correctional rehabilitation officer Jamie Maldonado, who was responsible for counselling and screening prisoners in Davis' unit with regard to community release programs and possible transfers. Davis claimed

that he was "getting short"—meaning that his sentence was expiring within months— and asked that he be given a lower security designation. Davis showed Maldonado a document corroborating his assertion that his sentence was expiring. Maldonado reviewed Davis' computerized records, discovered that Davis was a federal prisoner and, accordingly, informed Davis that there was nothing he could do for him.

In February of 1990, Davis met at Somers with Kathryn Johnson, the Community Corrections Manager for the Boston office of the Federal Bureau of Prisons and told her that his State of Virginia detainer possibly had been dropped and showed her a document to that effect. Officials of the Bureau of Prisons reviewed Davis' file and determined that the detainer was still active.

On September 7, 1990, Davis was transferred to the Connecticut Community Correctional Center ("CCC") in New Haven, Connecticut, and placed in a maximum security status. Maximum security at CCC permits an inmate to work only in his housing unit, leaving three walls of security between the inmate and the community. Davis complained to Deputy Warden Michael Pozzetta that he was not satisfied with his security-level classification because he was due to be released soon. Davis told Pozzetta that officials at CCC either already had received or soon would receive information that would permit a reduction in his security level.

On October 18, 1990, the warden's office at CCC received through inter-office mail two documents pertaining to Davis. The first document was a letter dated October 5, 1990, written on stationery bearing the printed letterhead "U.S. Department of Justice, Federal Bureau of Prisons, Community Programs Office, Boston, Massachusetts." The letter was addressed to Mr. Larry Meachum, Commissioner of the CDC, and bore the signature of a fictitious "David V. Ingram" of the "U.S. Special Task Force." The document purported to terminate the Virginia Department of Corrections detainer and to move Davis' release date up to January 8, 1991.

The second document, dated April 27, 1990, was written in the form of a memoran-

dum on stationery bearing at the top of the page the printed words "United States Government memorandum." The document bore the signature of a fictitious United States Parole Commissioner, "Albert W. Kaslowe," from Washington, D.C., and was addressed to United States Attorney General Richard Thornburgh. The document provided the following instructions regarding Davis:

> PAROLE TO THE ACTUAL CUSTODY OF THE VIRGINIA DEPARTMENT OF CORRECTIONS ON OR BETWEEN MAY 23, 1990 AND JUNE 23, 1990.

> IF DETAINER IS WITHDRAWN, AND/OR VIRGINIA NEGLECTS TO PICK-UP INMATE BY JUNE 23, 1990; INMATE WILL BE CONTINUED TO A RELEASE DATE OF JANUARY 8, 1991. AS DETAINER WILL THEREBY BECOME VOID WITH THE UNITED STATES JUSTICE DEPARTMENT.

Davis' fingerprints later were found on this memorandum. It is undisputed that both of these documents were fraudulent and factually inaccurate. Most importantly, contrary to the second document, Davis' release date was October 24, 2011—twenty years later than the forged document indicated. Also, contrary to both documents, the Virginia detainer was active.

Not realizing that these documents were fraudulent, the warden of CCC handed them to Deputy Warden Pozzetta as evidence of Davis' assertion that he should receive a reduced security assignment. Davis' security status subsequently was reduced so that he could participate in a minimum security work detail. This permitted him to work outside his housing unit, with only one perimeter wall separating him from the community.

Two or three weeks later, Davis requested a further reduction in his security status to permit him to work outside all security perimeters. Working under the supervision of a corrections officer or, possibly, only a maintenance worker, Davis would have access to the street in this security mode. The request prompted a review of Davis' file. The review revealed contradictions among the documents in the file and culminated in an FBI investigation. The falsity of the docu-

ments was uncovered, and Davis' security classification was upgraded to maximum level. On November 30, 1990, FBI agents, accompanied by Connecticut corrections officers, searched Davis' cell and seized numerous items, including blank stationery similar to the forged documents.

On February 18, 1992, Davis was indicted on one count of knowingly attempting to escape from the custody of an institutional facility in which he was lawfully confined by the Attorney General of the United States, in violation of 18 U.S.C. § 751, and two counts of knowingly making or using a false writing or document, knowing the same to contain a false statement, in a matter within the jurisdiction of the United States Department of Justice, in violation of 18 U.S.C. § 1001. On August 10, 1992, after a bench trial, Judge Nevas found Davis guilty on all three counts of the indictment.

## DISCUSSION

Davis primarily raises two issues on appeal. First, Davis argues that there was insufficient evidence to convict him of attempting to escape. Second, he contends that the false statements made to the state officials acting under contract with a federal agency did not satisfy the requirement of 18 U.S.C. § 1001 that the false statement be made in a matter "within the jurisdiction of any department or agency of the United States." We find that both of these claims lack merit.

### 1. Attempted Escape

■ A defendant bears a heavy burden when challenging the sufficiency of the evidence. *See United States v. Medina,* 944 F.2d 60, 66 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992). Evidence must be viewed as a whole rather than in isolation, with every reasonable inference drawn in the Government's favor. *United States v. Villegas,* 899 F.2d 1324, 1339 (2d Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990). A reviewing court need only determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Vir-*

*ginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ A conviction for attempted escape requires proof beyond a reasonable doubt that the defendant attempted to escape "from any institution or facility in which he [was] confined by direction of the Attorney General" and that "the custody or confinement [was] by virtue of an arrest on a charge of felony, or conviction of any offense." 18 U.S.C. § 751(a). Davis stipulated that, as a result of a conviction for an offense, he was lawfully committed to the custody of the Attorney General and that he was confined by the direction of the Attorney General at all relevant times. He argues only that he did not attempt to escape.

■ We have adopted the "substantial step" approach for determining whether conduct constitutes a criminal attempt. *See United States v. Ivic,* 700 F.2d 51, 66 (2d Cir.1983).

> '[A] person is guilty of an attempt ... if, acting with the kind of culpability otherwise required for commission of the crime, he ... purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of a crime.'

*Id.* (quoting Model Penal Code § 5.01(1)(c) (Proposed Official Draft 1962)); *accord United States v. Shoulberg,* 895 F.2d 882, 885 (2d Cir.1990); *United States v. Delvecchio,* 816 F.2d 859, 861 (2d Cir.1987). For conduct to amount to a substantial step it must be " 'something more than mere preparation, yet [perhaps] less than the last act necessary before the actual commission of the substantive crime.' " *Shoulberg,* 895 F.2d at 885 (quoting *United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981)). This determination depends necessarily on the particular factual context of each case. *Id.* Conduct is not considered a substantial step unless it is strongly corroborative of the criminal intent of the accused. *Ivic,* 700 F.2d at 66. With these considerations in mind, we must determine, "whether sufficient proof ex-

ists to establish that the accused possessed the requisite criminal intent" and, if so, "whether the accused's conduct may be viewed as sufficiently corroborative of his established criminal intent." *United States v. Mowad,* 641 F.2d 1067, 1073 (2d Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981); *see Ivic,* 700 F.2d at 66–67.

The Government argued at trial that Davis intended to escape either by waiting for his fraudulently altered release date of January 8, 1991, or by escaping from confinement under a diminished security status. Davis refers to these theories as the "warden's release" theory and the "reduced security level" theory, respectively. The district court found that Davis intended to escape using one of these methods and that his creation of the two fraudulent documents constituted a substantial step toward commission of this crime. More particularly, the court found that Davis believed he could reduce his security level to one that would enable him to leave the facility and escape. Under either theory, there was sufficient evidence in the record for the district court to conclude that Davis attempted to escape.

#### a. *Warden's Release Theory*

■ With respect to the warden's release theory, Davis' intent to escape is shown by the fact that the forged letters moved his release date up more than twenty years. Davis asserts that he could not have intended to escape through his being released by the warden because he knew it was impossible to escape in this manner. Noting language in the January 8 letter indicating that a release order would be sent from the Department of Justice to the Marshals Service, Davis argues that he knew that the procedure required that he be transferred to a United States Marshal, and therefore he knew he could not simply be released by the warden. We are not persuaded that Davis did not believe he could escape in this manner. Davis succeeded in reducing his security status by the use of forged documents, and other forged documents may have provided for release to someone other than a United States Marshal.

Davis' conduct is sufficiently corroborative of his established criminal intent to escape: he created false documents indicating an early release; he placed these documents in the warden's mail; and he laid the groundwork for the receipt of the documents by telling Deputy Warden Pozzetta that he was due to be released soon. Viewed in the light most favorable to the Government, Judge Nevas properly found that Davis' conduct constituted a substantial step toward escaping from CCC.

#### b. *Reduced Security Level Theory*

■ With respect to the reduced security level theory, Davis' intent is shown through his successive attempts to have his security level reduced. Even after he succeeded in having his security status reduced from maximum security to minimum security work detail, he requested that his security status be further reduced to outer perimeter security. This change would have resulted in Davis working outside of the prison walls in New Haven and being supervised by one guard or perhaps only a maintenance worker. Davis' acts are sufficiently corroborative of his criminal intent here, as they were corroborative of his criminal intent under the first theory. Moreover, Davis made his attempt at escape while at CCC, where his record was unknown and where his chances of success were greater because of the availability of outer perimeter work.

Davis' contention that he was seeking to lower his security level only to improve his prison conditions is unconvincing. In light of his long sentence, his false document providing for release in eleven weeks would have gained him only a very short time of improved prison conditions and certainly would have resulted in repercussions once discovered. Davis contends that the district court erred in convicting him because there were two inferences that could have been drawn—one consistent with innocence (forging letters only to improve his condition) and one consistent with guilt (to escape)—and the district court should have adopted the conclusion consistent with innocence. There is no requirement, however, that a finding of guilt by a district court " 'exclude every reasonable

hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.'" *See United States v. Maxwell,* 920 F.2d 1028, 1035 (D.C.Cir.1990) (quoting *United States v. Harrell,* 737 F.2d 971, 979 (11th Cir.1984), *cert. denied,* 469 U.S. 1164, 105 S.Ct. 923, 83 L.Ed.2d 935, 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985)). Accordingly, we find no basis for disturbing the district court's finding of guilt.

### 2. False Statements in a Matter Within the Jurisdiction of a Department or Agency of the United States

■ Davis asserts that he did not make false documents or writings in a matter within the jurisdiction of a department or agency of the United States. *See* 18 U.S.C. § 1001. Davis first argues that he did not violate section 1001 because he made documents containing false statements *from,* not *to,* the federal agencies. This distinction is irrelevant because there is no requirement that a false statement be made *to* the federal agency; it must only have been made in "any matter *within the jurisdiction of any department or agency of the United States.*" 18 U.S.C. § 1001 (emphasis added); *see United States v. Candella,* 487 F.2d 1223, 1227 (2d Cir.1973) ("[A] violation of § 1001 does not require that the false statement must actually have been submitted to a department or agency of the United States, but rather that it was contemplated that the statement was to be utilized in a matter which was within the jurisdiction of such department or agency."), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974).

■ Davis next argues that the false statements were not related to matters within the jurisdiction of the federal government because they were sent to officials at CCC— a state agency rather than a federal agency. A federal department or agency has jurisdiction within the meaning of 18 U.S.C. § 1001 "when it has the power to exercise authority in a particular situation," as distinguished from "matters peripheral to the business of that body." *United States v. Rodgers,* 466 U.S. 475, 479, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984). In situations in which a federal agency is overseeing a state agency,

it is the mere existence of the federal agency's supervisory authority that is important to determining jurisdiction. *See United States v. Petullo,* 709 F.2d 1178, 1180 (7th Cir.1983). The district court found that the false statements made by Davis to officials at CCC were within the jurisdiction of the Bureau of Prisons and the Marshals Service because the Marshals Service had a contract with Connecticut to house federal prisoners and the Bureau of Prisons utilized this contract to house prisoners within its control.

■ The Bureau of Prisons has primary responsibility for the placement, care and subsistence of "all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(2). Merely because the Bureau of Prisons chose to delegate part of this responsibility to a state facility does not remove these matters from its jurisdiction. The fraudulent documents given by Davis to CCC officials related to the determination of Davis' release date and to his actual parole and release, matters clearly within the authority of the Bureau of Prisons and over which authority remained in the Bureau of Prisons pursuant to the CDC's own administrative directive. Moreover, the proper release of prisoners is a primary duty of the Bureau of Prisons and the Marshals Service and cannot, as Davis suggests, be considered a matter peripheral to the business of these agencies. The district court was thus correct in finding that Davis' statements were made within the jurisdiction of these agencies. We have considered Davis' remaining arguments and find them to be without merit.

### CONCLUSION

The judgment of the district court is affirmed for the foregoing reasons.