A08A2190. TESLER v. THE STATE.
(672 SE2d 522)

MILLER, Chief Judge.

Arthur Tesler was indicted on charges of violating his oath as a public officer (OCGA § 16-10-1) (Count 1); making false statements to a state or local government agency or department (OCGA § 16-10-20) (Count 2); and false imprisonment under color of law (OCGA § 16-5-42) (Count 3). A jury convicted Tesler of Count 2 of the indictment, making false statements to a state or local government agency or department, but acquitted him of all other charges. Tesler now appeals his conviction, asserting: (1) that the State failed to prove venue as to Count 2 of the indictment; and (2) that the evidence was insufficient to sustain his conviction, because he made the false statements at issue to federal, rather than state or local, law enforcement authorities. Finding that the State failed to prove venue, we reverse.

Viewed in the light most favorable to the jury's verdict (*Drammeh v. State*, 285 Ga. App. 545, 546 (1) (646 SE2d 742) (2007)), the record shows that in November 2006, Tesler worked as an investigator in the Narcotics Unit of the City of Atlanta Police Department (the "APD"). Tesler frequently partnered with two other narcotics investigators in his unit, Gregg Junnier and J. R. Smith. On November 21, 2006, Tesler, Junnier, and Smith arrested Fabian Sheats for possession of cocaine and marijuana with intent to distribute. This arrest was the third time in an approximately seven-month period that Sheats had been charged with a cocaine-related crime. The officers told Sheats that this was his "third strike" arrest, but stated that if he would provide them with information about the person supplying him with drugs, they would release him without charging him for his most recent offense.

Sheats eventually told the officers that he had purchased his drugs earlier that day from a man known as "Sam," who had an entire kilo of cocaine at his house. The officers asked Sheats to make a "controlled buy" of additional cocaine from "Sam," so that they could confirm his information. Sheats refused, saying that he was too afraid of Sam. Junnier then called Alex White, a confidential informant frequently used by the APD, to see if he would make the controlled buy. White was willing to make the purchase, but explained that he did not have a car.

The officers drove back to the police station with Sheats, and in the car discussed the fact that, given the large quantity of cocaine at

issue, they should not do a "knock and talk" at Sam's residence, but instead should get a search warrant for the house. Neither Tesler nor Junnier, however, was willing to apply for a warrant without witnessing a controlled buy from the house. After Smith indicated that he was willing to apply for a warrant without witnessing a controlled buy, the men had Sheats direct them to Sam's house. Riding with the officers in their patrol car, Sheats guided them to a house at 933 Neal Street in southwest Atlanta, and claimed that he had purchased the cocaine at that residence.

The group drove back to the police station, where Smith exited the car, went inside and filled out an electronic application for a "no-knock" search warrant,[1] returning to the police car approximately 30 minutes later with the warrant in hand. In the affidavit he submitted in support of the search warrant, Smith stated, inter alia, that he and Tesler had witnessed a confidential informant make a controlled buy of cocaine at 933 Neal Street, from an individual known as "Sam." Smith also averred that a "no-knock" warrant was necessary because the house was equipped with electronic surveillance devices.

After Smith obtained the warrant, the three officers met up with other members of the Narcotics Unit to execute it. Because it was a no-knock warrant, police executed it by breaking down the front door of the Neal Street residence with a battering ram. Junnier then entered through the front door shouting "Atlanta Police, search warrant!" He was met by a "flash of light" and saw what he thought was a black male standing inside the house with a gun. Junnier returned fire as he fell backward, down the front steps, and other officers also began shooting. Wounded in the gunfire were several police officers and the lone occupant of the house, 92-year-old Kathryn Johnston. Ms. Johnston later died of a gunshot wound to the chest. Ms. Johnston's wounds and those sustained by police officers all resulted from bullets fired from police weapons.[2] The only contraband discovered at Ms. Johnston's residence was a small amount of marijuana, which Smith had planted at the scene after he realized that the Neal Street residence was not, in fact, a drug house.

Shortly after the raid on Ms. Johnston's home, Smith called Alex White "in a panic," explaining that he had "screwed up," and asking White to lie to investigators and tell them that he had made a controlled drug buy earlier that day from a black male named Sam at

---

[1] A "no-knock" warrant permits police to enter a home without knocking in advance.

[2] A later investigation determined that Ms. Johnston, apparently believing that she was the victim of a home invasion, had fired a single bullet from a revolver she owned. That same investigation showed that Tesler had fired no bullets from his gun.

933 Neal Street. White agreed to lie, and took notes on the details Smith provided him of the alleged transaction.[3]

Later that same evening, Tesler went to the hospital to check on the wounded officers. There he saw Smith, who told Tesler that he was mentioned in the warrant, and that Tesler therefore "might be in trouble." Smith explained that when filling out the electronic application for the Neal Street warrant, he had "cut and pasted" information from a previous application that had contained Tesler's name, and that he had failed to delete Tesler's name before submitting the application.

The following day, Tesler reported to APD headquarters to give a statement to the Homicide Division regarding the issuance and execution of the Neal Street warrant. After he arrived at headquarters, Smith pulled Tesler aside, showed him a copy of the warrant, and told Tesler to "get familiar with it[, because] you're in it." Smith then explained to Tesler the "story" regarding the warrant that Smith was going to give to the Homicide Division, and told Tesler "to stick with [the story]." Smith's "story" essentially mirrored the facts set forth in his affidavit in support of the warrant. Specifically, Smith instructed Tesler to tell Homicide that Tesler and Smith were driven by Alex White to 933 Neal Street, where they witnessed White exit the car, approach the house, and buy drugs. White then returned to his car and drove Tesler and Smith back to their patrol car. Smith showed Tesler a diagram he had drawn that showed the location where they allegedly met with White to drive to 933 Neal Street, and showed where and in what position the officers and White had parked their respective cars.

Later that day, before Tesler gave his statement to Homicide, he spoke with Junnier by cell phone, and Junnier instructed him to call Alex White and get details on White's car, such as the exact make and model. Junnier further told Tesler to "stick with the story" provided to him by Smith. Although Tesler called White to obtain the details about his car prior to giving his statement to Homicide, Homicide did not question him about the events giving probable cause for the warrant. Tesler was the last one to give his statement, and Homicide questioned him only about his role in executing the warrant.

During the two to three weeks following the incident, Tesler, Junnier, and Smith met on at least three occasions to discuss their "story" regarding the Neal Street warrant. At the second of these meetings, Smith brought copies of a written "script" for both Junnier and Smith, that set forth in more detail the fictionalized events used to justify the issuance of the warrant. The third meeting

---

[3] Those details mirrored the "facts" that Smith had set forth in his warrant application.

occurred when Junnier picked up Tesler to drive him to the Police Benevolent Association ("PBA") to meet with an attorney provided the officers by the PBA. Before going to the PBA, however, Junnier picked up Smith and then drove all three men on the route they allegedly drove with Alex White to make the controlled drug buy at Neal Street. During the drive, Smith pointed out to Tesler the specific location he should identify in his statement as the place where Tesler and Smith met up with White on November 21.

Unbeknownst to any of the officers, White, after learning the circumstances surrounding the execution of the Neal Street warrant, had reconsidered his decision to corroborate Smith's story regarding the controlled drug buy. Thus, on November 22, White had contacted federal authorities and explained to them that Junnier and Smith had asked him to lie to investigators about making a controlled buy at Ms. Johnston's residence. The federal authorities relayed White's information to the APD and, at the request of the Atlanta police chief, the FBI began a joint investigation with the APD, the Georgia Bureau of Investigation ("GBI"), and the Fulton County District Attorney's Office of the events surrounding the issuance and execution of the Neal Street warrant.

On December 7, 2006, at the request of the FBI, Tesler met with two FBI agents at an FBI office. In responding to the agents' questions, Tesler followed the written "script" given to him by Smith, and told the agents, inter alia, that he had witnessed White make a controlled buy of drugs at 933 Neal Street on November 21. On January 4, 2007, Tesler again met with FBI agents, along with representatives from the United States Department of Justice and the Fulton County District Attorney's Office. At that meeting, Tesler recanted his earlier statement and admitted that he had not witnessed a drug sale made from Ms. Johnston's residence.

Junnier and Smith were each indicted in federal court for violating Ms. Johnston's civil rights[4] and were indicted in the Superior Court of Fulton County on several charges, including felony murder. Both men entered into negotiated plea agreements with respect to both the federal and state charges against them. Under their state plea agreements, Junnier and Smith pled guilty to manslaughter, thereby avoiding the felony murder charge. Additionally, Junnier agreed to cooperate in the investigation and testified as a State's witness against Tesler in the trial below.

---

[4] We take judicial notice of the fact that, following Tesler's trial below, he was indicted on federal charges related to this case. On October 30, 2008 Tesler pled guilty to the federal charges, with the understanding that the United States Attorney would recommend he be sentenced to ten years in federal prison.

As noted earlier, Tesler was convicted only of Count 2 of the indictment, making a false statement to a state or local government agency or department. He now appeals from that conviction.

1. Tesler was convicted of making a false statement "in [a] matter within the jurisdiction of [a] department or agency of state government or of the government of any county, city, or other political subdivision of this state. . . ." OCGA § 16-10-20. On appeal, Tesler asserts that his conviction must be reversed because the State failed to prove that the false statement was made in Fulton County and therefore failed to prove venue. We agree.

> Our Georgia Constitution requires that venue in all criminal cases must be laid in the county in which the crime was allegedly committed. Venue is a jurisdictional fact, and is an essential element in proving that one is guilty of the crime charged. Like every other material allegation in the indictment, venue must be proved by the prosecution beyond a reasonable doubt. Proof of venue is a part of the State's case, and the State's failure to prove venue beyond a reasonable doubt renders the verdict contrary to law, without a sufficient evidentiary basis, and warrants reversal.

(Citation and punctuation omitted.) *Moody v. State*, 279 Ga. App. 457 (631 SE2d 473) (2006). OCGA § 17-2-2 (a) provides that actions shall be tried "where the crime was committed, except as otherwise provided by law." "As OCGA § 16-10-20 provides for no specific statutory venue, our determination as to the venue for the crime will necessarily hinge on a resolution of the inquiry, 'Where was the crime committed?' " *Spray v. State*, 223 Ga. App. 154, 157 (2) (476 SE2d 878) (1996).

Under OCGA § 16-10-20, a person may commit the crime of giving a false statement in one of three ways: (1) by using "any trick, scheme or device" to falsify or conceal a material fact; (2) by affirmatively making a false statement or representation; or (3) by knowingly making or using a false writing. See *Dawkins v. State*, 278 Ga. App. 343, 344-345 (629 SE2d 45) (2006). The indictment, however, specifically charged Tesler with violating OCGA § 16-10-20 by using a scheme (the agreement to cover up Smith's falsification of the warrant application) to conceal or falsify a material fact.[5] Thus, the criminal conduct charged occurred at the time and place where

---

[5] In light of the possibility that the State may retry Tesler, we note that the trial court erroneously instructed the jury that it could find Tesler guilty of violating OCGA § 16-10-20 if it found that he made a false statement using any one of the three methods set forth in the statute.

Tesler actually lied to investigators — i.e., at the offices of the FBI. It was there that Tesler implemented the alleged scheme and either concealed or falsified a material fact, by telling the agents that he had witnessed a controlled buy of drugs at 933 Neal Street. See *Spray*, supra, 223 Ga. App. at 157 (2) (an act of "falsifying" occurs at the time a false statement is made, and therefore venue is appropriate in the county where the statement was made); *State v. Johnson*, 269 Ga. 370, 372 (2) (499 SE2d 56) (1998).

On appeal, the State concedes that it introduced no evidence showing the location of the FBI office at issue. The State nevertheless argues that venue was appropriate in Fulton County because: (1) Tesler's statement resulted from a conspiracy between Tesler, Junnier, and Smith to conceal from investigators the true facts surrounding the application for the Neal Street warrant; and (2) at least one overt act in furtherance of that conspiracy occurred in Fulton County. See, e.g., *Davis v. State*, 225 Ga. App. 564, 566 (3) (484 SE2d 284) (1997) ("Venue in a conspiracy prosecution is properly laid either in the jurisdiction where the conspiracy was formed or in any jurisdiction wherein a conspirator committed an overt act in furtherance of the conspiracy.") (citation and punctuation omitted.). Assuming arguendo that Tesler engaged in a cover-up conspiracy, the fact remains that Tesler was not convicted of conspiring to falsify or conceal a material fact; he was convicted of actually falsifying or concealing a material fact — a crime that he admitted to when he testified at trial. Accordingly, he could not be convicted of conspiring to commit that crime. See OCGA § 16-4-8.1 (a "person may not be convicted of both conspiracy to commit a crime and the completed crime").

To satisfy its burden of proof on venue, therefore, the State was obligated to prove that the FBI office was located in Fulton County. Its admitted failure to meet this burden requires us to reverse Tesler's conviction. See *Lynn v. State*, 275 Ga. 288, 289 (2) (565 SE2d 800) (2002) ("[F]or at least the last one hundred years, this Court has reversed criminal convictions when the State failed to prove venue.") (footnote omitted).

2. Because "[t]he failure to establish venue does not bar re-trial in a court where venue is proper and proven[,]" (*Grier v. State*, 275

---

[I]t is error to charge the jury that a crime may be committed by [any] of two [or more] methods, when the indictment charges it was committed by one specific method. If there is a reasonable possibility that the jury convicted the defendant of the commission of a crime in a manner not charged in the indictment, then the conviction is defective because of a fatal variance between the proof at trial and the indictment returned by the grand jury.

*Skillern v. State*, 240 Ga. App. 34, 35 (2) (521 SE2d 844) (1999).

Ga. 430, 431 (1) (569 SE2d 837) (2002) (citation and punctuation omitted)) we also address Tesler's claim that the evidence was insufficient to support his conviction under OCGA § 16-10-20. Specifically, Tesler asserts that the statute is designed to punish only those false statements made directly to a department or agency of state or local government. Tesler argues that because he made his statement to federal agents, OCGA § 16-10-20 cannot reach his conduct. We disagree.

In support of his argument, Tesler relies on this Court's decision in *Gentry v. Volkswagen of America*, 238 Ga. App. 785 (521 SE2d 13) (1999). In that case, the Gentrys alleged that their child was killed as a result of Volkswagen's defective design of its passive restraint system. In addition to tort claims, the Gentrys also asserted a RICO claim against Volkswagen. Id. at 790 (2). The predicate acts asserted in support of the RICO claim included an alleged violation of OCGA § 16-10-20, based on Volkswagen's purported misrepresentations to the National Highway Transportation Safety Administration ("NHTSA"), that its passive restraint system complied with certain NHTSA regulations. Id. This Court found that the Gentrys could not prove a violation of OCGA § 16-10-20, reasoning that

> [t]he statute's application is limited to statements or representations made to state or local government about matters within its jurisdiction . . . [and] all of the allegations of fraud and misrepresentation concern statements and representations made to the . . . NHTSA, a federal agency, about compliance with NHTSA's regulations. Volkswagen's compliance with [those regulations] is a matter outside the jurisdiction of state or local government.

Id. at 790-791 (3).

Focusing on the statement that OCGA § 16-10-20 applies only "to statements or representations made to state or local government," Tesler argues that the statute cannot be used to prosecute false statements made to federal agents. *Gentry*, however, did not address the question of whether false statements made to an entity other than a state or local government violate OCGA § 16-10-20, where those statements are made "in any matter within the jurisdiction of any department or agency of state [or local] government." Accordingly, the language on which Tesler bases his argument must be viewed as dicta, and does not control the case at hand. See *Zepp v. Brannen*, 283 Ga. 395, 397 (658 SE2d 567) (2008) (defining dicta as "a statement in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand," and noting that Georgia courts "are not bound

to follow ... dicta [from] a prior case where the point now at issue was not fully debated") (citations and punctuation omitted). See also *Cohens v. Virginia*, 19 U. S. 264, 399 (6 Wheat. 264, 5 LE 257) (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").

In addressing the question of whether Tesler's false statement to FBI agents can be prosecuted under OCGA § 16-10-20, we are guided by those federal decisions interpreting 18 USC § 1001. That statute, on which OCGA § 16-10-20 was apparently based, punishes false statements made "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." Federal courts have uniformly rejected the argument that a violation of § 1001 requires that a false statement have been made or submitted to a federal department or agency. See, e.g., *United States v. Green*, 745 F2d 1205, 1208 (c) (2) (9th Cir. 1984) ("Under [§] 1001, the false statement need not be made directly to [a federal] government agency; it is only necessary that the statement relate to a matter in which a federal agency has power to act. [Cit.]"); *United States v. Hooper*, 596 F2d 219, 223 (7th Cir. 1979) ("[Section] 1001 does not require false statements or documents to be presented directly to a governmental department so long as such statement or document is used in some intended relationship to a matter within the jurisdiction of the department."); *United States v. Candella*, 487 F2d 1223, 1227 (2d Cir. 1973) (holding that the language of § 1001 contemplates only "that the [false] statement was to be utilized in a matter which was within the jurisdiction of [a federal] department or agency"), cert. denied, 415 U. S. 977 (94 SC 1563, 39 LE2d 872) (1974); *United States v. Herring*, 916 F2d 1543, 1547 (A) (11th Cir. 1990). Accordingly, federal courts

> have routinely upheld § 1001 convictions for false statements made to state or local government agencies receiving federal support or subject to federal regulation [and] ... for false statements made to private entities receiving federal funds or subject to federal regulation or supervision.

(Citations omitted.) *United States v. Gibson*, 881 F2d 318, 322 (III) (A) (6th Cir. 1989). See also *United States v. Davis*, 8 F3d 923, 929 (2d Cir. 1993) (holding that false statements made to state officials acting under contract with a federal agency could be prosecuted under § 1001); *United States v. Suggs*, 755 F2d 1538, 1542 (11th Cir. 1985) (where Georgia Department of Labor received federal funds,

defendant could be convicted under § 1001 for falsifying departmental travel vouchers).

Similarly, there is nothing in the language of OCGA § 16-10-20 that requires the State to prove that Tesler made his false statement directly to a department or agency of either the City of Atlanta or Fulton County. Rather, the State need only show that the statement was made "in a matter within the jurisdiction" of one or more of those governments. In determining when a matter falls within the jurisdiction of a state or local department or agency, we again turn to the federal courts' interpretation of 18 USC § 1001 for guidance.

The United States Supreme Court has repeatedly held that "the term 'jurisdiction' should not be given a narrow or technical meaning for the purposes of § 1001." *Bryson v. United States*, 396 U. S. 64, 70 (II) (90 SC 355, 24 LE2d 264) (1969). See also *United States v. Rodgers*, 466 U. S. 475, 479-482 (104 SC 1942, 80 LE2d 492) (1984); *United States v. Gilliland*, 312 U. S. 86, 93 (61 SC 518, 85 LE 598) (1941). As the Court explained in *Rodgers*:

> The most natural, nontechnical reading of the statutory language is that it covers all matters confided to the authority of an agency or department. Thus, Webster's Third New International Dictionary 1227 (1976) broadly defines "jurisdiction" as, among other things, "the limits or territory within which any particular power may be exercised: sphere of authority." *A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation.* See *United States v. Adler*, [380 F2d 917, 922 (2d Cir. 1967), cert. denied, 389 U. S. 1006 (88 SC 561, 19 LE2d 602) (1967)] ("the word 'jurisdiction' as used in the statute must mean simply the power to act upon information when it is received"). Understood in this way, the phrase "within the jurisdiction" merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body.

(Emphasis supplied.) *Rodgers*, supra, 466 U. S. at 479. See also *United States v. Lawson*, 809 F2d 1514, 1518 (11th Cir. 1987).

The evidence in this case shows that the FBI interviewed Tesler as part of a joint investigation with the APD, the GBI, and the Fulton County District Attorney's Office into the facts surrounding the issuance and execution of the Neal Street warrant. The Fulton County District Attorney's Office had the power to exercise its authority to indict and prosecute any crimes uncovered during that investigation that occurred in Fulton County. In other words, the

District Attorney's Office had "the power to act upon information" received as a result of the joint investigation. *Rogers*, supra, 466 U. S. at 479. Thus, Tesler's false statements to the FBI, made as a part of that investigation, were made in a matter within the jurisdiction of the District Attorney's Office. As a result, those false statements violated OCGA § 16-10-20.

In conclusion, we reverse Tesler's conviction but hold that the evidence supported the jury's finding that Tesler's conduct violated OCGA § 16-10-20. Should the State be able to prove venue, therefore, it may retry Tesler on Count 2 of the indictment.

*Judgment reversed. Ellington, J., concurs. Blackburn, P. J., concurs specially.*

BLACKBURN, Presiding Judge, concurring specially.

I concur fully in Division 1, which concludes that the State failed to meet its burden to prove venue. However, with respect to Division 2, I respectfully disagree that the State's evidence as to Count 2 of the indictment would suffice to prove an offense under OCGA § 16-10-20, which criminalizes false statements made in a "matter within the jurisdiction of any department or agency of state [or local] government."

The State's prosecution was based on false statements made solely to federal agents who were investigating possible federal crimes with no Georgia agents present. As pointed out by the majority, the federal code contains an analogous statute criminalizing false statements made to federal officers. See 18 USCS § 1001. A federal case addressing that statute's former version (at 18 USCS § 80) pointed out that the criminal act is the deception itself, but only if it falls within a matter within the jurisdiction of the federal government. See *United States v. White*.[6] As noted in that case, the criminality of such acts must have limits under the statute:

> If [a federal offense] can be stretched to cover deception that is practiced upon a state policeman, then it can be stretched to cover any deception or false statement made, for instance to an inquisitive neighbor or friend or business associate concerning your citizenship, or your income, or any of the almost innumerable facts of life which are now regulated by — and thus within the "jurisdiction" of some department or agency of the Government.

Likewise, I believe that a state offense under OCGA § 16-10-20

---

[6] *United States v. White*, 69 FSupp. 562, 564 (D. Cal. 1946).

should not be stretched to cover a deception practiced solely upon federal agents. Therefore, I believe false statements made solely to federal agents are properly prosecuted under federal law, and such statements should not serve as the sole basis for a violation of OCGA § 16-10-20.

It is undisputed that Tesler made no false statements to the APD during its investigation. Tesler made the false statements to federal agents during their investigation and while no state or local officers were present. Such an act does not occur during a "matter within the jurisdiction" of the state or local government. The federal government is not barred from prosecuting Tesler under 18 USCS § 1001 based on the facts here, but the State cannot prosecute him under OCGA § 16-10-20 as no state agents were involved. I therefore concur in the judgment reversing Tesler's conviction, but I respectfully disagree with the analysis in Division 2.

DECIDED JANUARY 15, 2009 — 

*McKenney & Froelich, William J. McKenney, Adam M. Hames,* for appellant.

*Paul L. Howard, Jr., District Attorney, Elizabeth A. Baker, Assistant District Attorney,* for appellee.