S11A0606. HALEY v. THE STATE.
(712 SE2d 838)

NAHMIAS, Justice.
A Hall County jury convicted Andrew Scott Haley of violating OCGA § 16-10-94 by tampering with evidence with intent to prevent the apprehension and obstruct the prosecution of another person and violating OCGA § 16-10-20 by making a false statement in a matter within the jurisdiction of the Georgia Bureau of Investigation (GBI). He appeals, challenging both of his convictions on various

---

grounds. Most significantly, Haley contends that OCGA § 16-10-20 is unconstitutional on its face and as applied because it infringes the freedom of speech. We conclude that the false statement statute, when properly construed to require that the defendant make the false statement with knowledge and intent that it may come within the jurisdiction of a state or local government agency, is constitutional. The jury was correctly charged on this element, the evidence was sufficient to prove it and the other elements of an OCGA § 16-10-20 violation, and Haley's asserted error regarding the GBI's jurisdiction is without merit. Accordingly, we affirm his false statement conviction. However, we reverse Haley's tampering with evidence conviction because the evidence at trial failed to prove that he made false evidence with the specific intent to prevent the apprehension or obstruct the prosecution of another person.

1. The evidence at trial, viewed in the light most favorable to the verdict, showed that Haley, under the user name "catchmekiller," made and posted two videos on the YouTube website. The videos were part of an online murder mystery "game" for participants who could post and review comments on the YouTube page to learn the identity of the "catchmekiller."

Haley posted his first video on February 1, 2009. He appeared in the video, but his face and voice were distorted. Haley said that during the game he would "confess to 16 murders." Each week there would be a new video with new clues, which would lead to the body of a missing murder victim, and "[o]nce all 16 bodies are found, you'll know exactly who I am and I will release the video or where I can be found." The video also made numerous references to the highly publicized nature of the underlying cases, the involvement of law enforcement agencies in investigating the cases, and the possibility that viewers of the videos might seek to identify and find who was releasing them. Thus, Haley said on his first video:

> The only clues that I am giving you are clues never released by the press or by a police department. What you may find out on a lot of these people was I'm going to tell you one thing, the police and the news will release something completely different. They may have released what she was wearing or what he is wearing that day and I'll prove different. That's the only way I'm gonna be able to prove that this video is real because I have knowledge that the police know about, the FBI know about and you don't. So every week a new clue, every clue leads to a new body, every new body leads to a new clue that eventually leads to me, hoping that no one else finds out who I am and why I've done this. Don't try to chase me. Don't try to catch me. . . .

The first person to solve all murders becomes the hero. . . . Be prepared to answer to the police, to answer to the FBI, to answer to the News. They're all gonna want to know how you did it. . . . If you decide to play the game, please go to video number two.

The video then listed the first "clues," which related to the case of Tara Grinstead, a young Georgia schoolteacher who had disappeared in 2005.

At trial, Haley testified that he obtained the clues for the first video in part from a missing persons website, which listed missing persons by state. He clicked on Georgia, selected the name of Tara Grinstead, and developed the "clues" used in the first video based on the information on the website as well as from news and YouTube sources.

Haley posted the second "catchmekiller" video on YouTube on February 12, 2009, again appearing with his face and voice distorted. This video began with an express discussion of the interest of law enforcement and the news media in the "game":

So I've decided to, uh, make some of the videos a little bit clearer, um, the FBI agent in Florida that keeps, uh, deciding to, uh, write me little emails and everything trying to, uh, intimidate me, um, she doesn't understand how the game works. . . . If the FBI agent doesn't stop trying to contact me, there's no way he's gonna find me, so it doesn't matter. Um, the second part is, there has already been some cheating going on by the news. The news decided that they were going to release the name as part of my clue. They didn't even discover the clue. Somebody else discovered the clue.

The video ended with references to a parkway in Augusta, Georgia, and gave another "clue" related to a murder victim's body or body part that supposedly would be found there.

Shortly after posting the first video, the "catchmekiller" also posted a comment on a YouTube web page devoted to the disappearance of Jennifer Kesse, a young woman from Orlando, Florida. The comment stated, "I think I might be able to help you." Drew Kesse, Jennifer's father, read the posting and sent a response asking "how can you help." The "catchmekiller" told him to go to "catchmekiller" on YouTube, as did several other people. Mr. Kesse then went to the "catchmekiller" website and watched the first video. Believing that the "catchmekiller" may have been responsible for his daughter's disappearance, Mr. Kesse contacted the local Orlando,

Florida police as well as Agent Gary Rothwell of the GBI, which had an active investigation of the Tara Grinstead missing person case. Mr. Kesse knew the GBI agent from an episode of the television show "48 Hours," which discussed the Jennifer Kesse and Tara Grinstead cases together; the show had aired on CBS just a few months earlier, in late 2008.

After watching the first "catchmekiller" video, Agent Rothwell testified, he thought "we had a person who was essentially confessing to killing Tara Grinstead, and we had to pursue that. We had a duty to pursue that lead." Rothwell requested assistance from the GBI's high-technology unit, which issued subpoenas to Google and YouTube for the internet protocol (IP) address of the computer that created the videos. The GBI ultimately traced the videos and identified Haley as the "catchmekiller."

When GBI agents questioned Haley, he readily admitted that he had created the "catchmekiller" YouTube website and videos, but he denied any involvement in Miss Grinstead's disappearance. He claimed that he "did this as a game and . . . didn't believe anybody would believe him." Haley's brother's girlfriend testified, however, that after Haley posted the first video, he said "someone might be coming to the house" because of it, although she claimed that he said it "jokingly." After learning of a news story about the "catchmekiller" game, Haley had stopped posting videos, removed the two he had already posted, and cancelled the YouTube account.

Haley was later charged in a two-count indictment. Count 1 alleged that he violated OCGA § 16-10-94 in that he

> did, with the intent to prevent the apprehension of and to obstruct the prosecution of another person, knowingly make and prepare false evidence, to wit: he made a video and disseminated it on the Internet via "YouTube," claiming he killed a person later identified as Tara Grinstead and gave clues as to the location of her body parts.

Count 2 charged Haley with violating OCGA § 16-10-20 in that he "did knowingly and wilfully make a false and fictitious statement and representation in a matter within the jurisdiction of the Georgia Bureau of Investigation, a governmental agency, by calling himself the 'catchmekiller' and stating that he killed 16 people." The indictment related to the first video, but the second video was also admitted into evidence at trial.

The jury convicted Haley on both counts. He was sentenced under the First Offender Act to ten years for tampering with evidence and five consecutive years for making a false statement, with three years to serve and the remainder on probation on both

counts. The trial court ordered that the custodial portions of the sentences would be suspended upon completion of 24 months at a work release program.

2. OCGA § 16-10-20 reads as follows (with emphasis added):

> *A person who knowingly and willfully* falsifies, conceals, or covers up by any trick, scheme, or device a material fact; *makes a false*, fictitious, or fraudulent *statement* or representation; or makes or uses any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry, *in any matter within the jurisdiction of any department or agency of state government or of the government of any county, city, or other political subdivision of this state* shall, upon conviction thereof, be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both.

Haley contends that this criminal statute, on its face and as applied to his case, violates the freedom of speech protected by the First Amendment to the United States Constitution and by Article I, Section I, Paragraph V of the 1983 Georgia Constitution. We conclude that, when properly construed, the statute is constitutional.

(a) Haley's constitutional arguments are premised on the assumption that a violation of OCGA § 16-10-20, with respect to its false statement component, has only two elements: (1) the defendant must knowingly and willfully make a false statement, and (2) the false statement must in fact be "in a matter within the jurisdiction" of a state or local department or agency. That premise is incorrect.

If Haley's premise were correct, OCGA § 16-10-20 would raise substantial free speech concerns. For better or worse, many Americans make many knowingly false statements about a wide variety of subjects from the serious to the mundane. And as review of the Georgia Code and our State's many county and municipal codes will reveal, almost every aspect of modern life falls "within the jurisdiction" of one or more state or local departments or agencies, as that term has been properly construed. See *Tesler v. State*, 295 Ga. App. 569, 577 (672 SE2d 522) (2009) (physical precedent only) (holding that a department or agency has jurisdiction under OCGA § 16-10-20 "'"when it has the power to exercise authority in a particular situation,"'" citing cases interpreting the analogous provision of 18 USC § 1001 and quoting this language from a 1967 Second Circuit case).

If all it took for a Georgia citizen to be convicted of a felony was the convergence of a lie and a government agency's jurisdiction over

the subject matter of the lie, a wide swath of communication would be criminal. And even recognizing that some types of false statements may not qualify as "speech" with First Amendment protection, see, e.g., *Garrison v. Louisiana*, 379 U. S. 64, 74-75 (85 SC 209, 13 LE2d 125) (1964) (holding that knowingly or recklessly false defamatory statements do not enjoy constitutional protection), the broad criminalization of false statements would have a chilling effect on protected speech that may be close to the line, including statements about public officials and public affairs that are in the heartland of First Amendment protection. As the United States Supreme Court explained in *Gertz v. Robert Welch, Inc.*, 418 U. S. 323 (94 SC 2997, 41 LE2d 789) (1974), while "there is no constitutional value in false statements of fact," such erroneous statements are "nevertheless inevitable in free debate" and "punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press." Id. at 340. Accordingly, "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." Id. at 341.

OCGA § 16-10-20, as Haley presumes it should be read, would also raise significant due process concerns. Even assuming that a knowingly false statement should be viewed as a verbal "act" rather than protected "speech," lying is commonplace, lies are often considered innocent (e.g., "white lies"), and we are aware of no federal or state laws (as opposed to moral and religious doctrines) that have deemed the making of a knowingly false statement, *without more*, a criminal act. If a person making a false statement need have no knowledge or intent of any kind that his deceptive statement will come to the attention of a government agency with authority to act on it, then the basic due process notion of fair notice would be in doubt. OCGA § 16-10-20 would then criminalize a wide array of statements that have always been deemed (at least legally) innocent, and the statute would be a trap for the unwary. Likewise, if OCGA § 16-10-20 allowed prosecutors to charge any knowingly false statement that the State happened to learn of and that happened to come within the jurisdiction of some state or local agency, then the opportunities for arbitrary and discriminatory enforcement would be substantial. See *Kolender v. Lawson*, 461 U. S. 352, 357 (103 SC 1855, 75 LE2d 903) (1983) ("As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").[1]

---

[1] A couple of the many possible hypothetical scenarios illustrate this point. A man might

To avoid such due process problems, courts may apply "the background rule of the common law favoring mens rea." *Staples v. United States*, 511 U. S. 600, 619 (114 SC 1793, 128 LE2d 608) (1994). In *Staples*, for example, the Supreme Court construed the federal statute prohibiting possession of an unregistered machinegun to require that a defendant know of the specific characteristics of his gun that make it a machinegun. See id. The Court explained that, although firearms are highly dangerous and regulated, because gun possession is so commonplace and is usually innocent, it was necessary to avoid a "construction of the statute [that] potentially would impose criminal sanctions on a class of persons whose mental state — ignorance of the characteristics of weapons in their possession — makes their actions entirely innocent." Id. at 614-615. Likewise, if a person did not know of the characteristic of his "act" of lying that made it legally blameworthy — the fact that it would likely reach and mislead a government agency — OCGA § 16-10-20 would be constitutionally problematic.

(b) We need not conclusively decide, however, whether OCGA § 16-10-20 is unconstitutional as Haley presumes it is construed, because that is not the correct construction of the statute — and correctly interpreted, the statute raises no substantial constitutional concern on its face or as applied to Haley's case. In addition to the two elements that Haley identifies, we conclude that the statute requires a defendant to know and intend, that is, to contemplate or expect, that his false statement will come to the attention of a state or local department or agency with the authority to act on it. That is, to follow the language of the statute, the defendant must *"knowingly and willfully* . . . make [the] false . . . statement *in* [a] matter within the jurisdiction" of a state or local department or agency. OCGA § 16-10-20 (emphasis added). This is probably the *best* construction of the statute, understood in light of its text and the judicial decisions interpreting the analogous federal statute at the time the Georgia statute was enacted.

But even if this were only a *reasonable* narrowing construction

---

return from a fishing trip to Lake Oconee, during which he caught nothing, and tell his friends a "fish story" – that he caught a "dozen big bass." If this story unexpectedly was passed on to the Department of Natural Resources, which decided to investigate because the number of fish the man lied about catching was above the legal limit of ten largemouth bass, see Ga. Comp. R. & Regs. r. 391-4-3-.05 (1) (a), the man could be convicted as a felon under OCGA § 16-10-20 – even if, when DNR rangers went to ask him about the story, he immediately admitted it was a lie. Or an opponent of a powerful elected official might write angrily, and falsely, in his private journal that the official had stolen public funds, an issue that local police have jurisdiction to investigate. If the opponent lost his journal in a taxi and it was found and given to the local police, he could be targeted for criminal prosecution under OCGA § 16-10-20, even if he immediately admitted to the police that the statements were false and he had no idea that they would ever come to the attention of the government.

of the statute, we would adopt it to avoid the serious constitutional concerns raised by the broader construction discussed above. See, e.g., *State v. Miller*, 260 Ga. 669, 673 (398 SE2d 547) (1990) (explaining that a " 'statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction' " (citation omitted)).

> "[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that [the legislature], like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that [the legislature] intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council*, 485 U. S. 568, 575 (108 SC 1392, 99 LE2d 645) (1988). Indeed, this Court previously interpreted this very statute in just this way, avoiding a defendant's claims that what is now OCGA § 16-10-20 is unconstitutionally overbroad and vague by construing it to require proof of an affirmative act by the defendant, relying on a 1977 Fifth Circuit case interpreting the same provision of 18 USC § 1001. See *Marcus v. State*, 249 Ga. 345, 345 (290 SE2d 470) (1982) (" 'In construing a statute that will often come dangerously close to trenching on fifth amendment rights, one ought not punish concealments or false statements that fall short of constituting affirmative acts.' " (quoting *United States v. London*, 550 F2d 206, 212 (5th Cir. 1977)).[2]

---

[2] We note that we previously rejected a different sort of vagueness challenge to OCGA § 16-10-20 in *Banta v. State*, 281 Ga. 615, 616-617 (642 SE2d 51) (2007). We also recognize that 18 USC § 1001 has been upheld against a First Amendment challenge by the new Fifth Circuit, although it is not clear how well that challenge was presented and the analysis rejecting it was perfunctory. See *United States v. Daly*, 756 F2d 1076, 1082 (5th Cir. 1985) (rejecting a tax protester's argument that 18 USC § 1001, as well as 18 USC § 371, 26 USC § 7206 (2), and 18 USC § 2, violates the First Amendment, stating simply that "[t]hese statutes punish actions, not speech," and "the speech Daly claims is protected was not itself the wrong for which he was convicted, but it was merely the means by which he committed the crimes of which he was convicted," citing no precedent involving 18 USC § 1001). See also *United States v. Plaskett*, 2008 WL 444552, *9 (D.V.I. 2008) (unreported opinion) (upholding the Virgin Islands' version of § 1001 against a First Amendment challenge, saying that the statute "punishes actions, not speech" and citing only *Daly* as a § 1001 precedent). Nevertheless, the constitutional concerns raised by a statute that allows a person to be convicted of a felony without any knowledge or intent that his false statement may reach a government agency or cause any other injury are substantial enough to reinforce our view that the General Assembly did not intend that

In determining the meaning of OCGA § 16-10-20, we look to its text as well as the interpretation that courts had given to the same language at the time the statute was enacted. Regarding the latter canon of statutory construction, where the General Assembly selects statutory language not from a Georgia statute that our own courts have previously interpreted but instead from a statute of another jurisdiction, we have explained that "the construction placed upon such statute by the highest court of that jurisdiction will be given such statute by the courts of this State." *Wilson v. Pollard*, 190 Ga. 74, 80 (8 SE2d 380) (1940). See also *Allen v. State*, 286 Ga. 392, 395 (687 SE2d 799) (2010) ("Because the language of OCGA § 24-9-84.1 (b) mirrors that of Rule 609 (b) of the Federal Rules of Evidence and the statutes based on Rule 609 (b) that have been enacted by several other states, we look for guidance to the judicial decisions of the federal courts construing Rule 609 (b) and the courts of our sister states construing their statutes modeled on Rule 609 (b).").

It is therefore important to recognize two points at the outset. First, OCGA § 16-10-20 was obviously modeled on the longstanding federal false statements statute, 18 USC § 1001. Indeed, with one exception very relevant to this case, OCGA § 16-10-20 tracked the text of § 1001 as it stood in 1976, simply replacing "any department or agency of the United States" with "any department or agency of state government." The important exception was that the General Assembly placed the "in any matter within the jurisdiction" phrase *after* the words "knowingly and willfully" and the description of the prohibited conduct, rather than in an introductory phrase.[3] Second, the General Assembly enacted Ga. Code Ann. § 26-2408, the predecessor to OCGA § 16-10-20, in 1976. See Ga. L. 1976, p. 483. The statute was amended in 1979 to extend its coverage to matters within the jurisdiction "of the government of any county, city, or other political subdivision of this state," instead of only state departments and agencies. Ga. L. 1979,

---

construction but rather the one we believe is a better reading of the Georgia statute in any event.

[3] In 1976, 18 USC § 1001 read as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Notably, the "within the jurisdiction" was originally placed at the end of what is now § 1001, as it is in OCGA § 16-10-20, but in 1948 it was moved to the beginning of § 1001 as part of "a housekeeping overhaul intended to make no substantive changes." *United States v. Yermian*, 468 U. S. 63, 78 (104 SC 2936, 82 LE2d 53) (1984) (Rehnquist, J., dissenting). We also note that, unlike OCGA § 16-10-20, 18 USC § 1001 has been amended several times since 1979. See 18 USC § 1001 (2011).

p. 1068. Other than a typographical correction made in 1982, see Ga. L. 1982, p. 3, § 16, the statute has not been changed since that time. Thus, the relevant judicial interpretations of the language from § 1001 that the General Assembly adopted nearly verbatim are the federal cases *from before 1979*, not more recent decisions. In particular, in the absence of United States Supreme Court decisions on point, we would assume the General Assembly looked to cases from the former Fifth Circuit, whose decisions interpreting § 1001 controlled the meaning of that federal law in Georgia.

The "knowingly and willfully" language of OCGA § 16-10-20 plainly provides a mens rea element, but neither the grammatical construction nor the punctuation of the statute indicates whether that term modifies only the three phrases that immediately follow it, including "mak[ing] a false . . . statement," or whether it also applies to whether the false statement was made "in any matter within the jurisdiction" of the state or local department or agency. As of the late 1970s, the federal courts, including the old Fifth Circuit, had widely held that a defendant need not make his false statement directly *to* the federal agency with jurisdiction. See, e.g., *United States v. Krause*, 507 F2d 113, 117 (5th Cir. 1975). Our Court of Appeals has properly construed OCGA § 16-10-20 in this way as well. See *Tesler*, 295 Ga. App. at 576. Indeed, the statutory language would not bear a construction so tightly linking the false statement and the government agency, since the legislature used the phrase *"in any matter within the jurisdiction of"* a government agency rather than simply *"to"* a government agency. Compare e.g., OCGA § 16-10-26 ("A person who willfully and knowingly gives or causes a false report of a crime to be given *to* any law enforcement officer or agency of this state is guilty of a misdemeanor.").

On the other hand, and while there was less consistency on this point, at the time OCGA § 16-10-20 was enacted and substantively amended, several leading federal cases interpreted § 1001 to require that the false statement "inevitably" deceive a federal agency. See *Krause*, 507 F2d at 117 (citing *United States v. Candella*, 487 F2d 1223 (2nd Cir. 1973)). The Second Circuit in *Candella* had explained that

> [c]ase law makes it clear . . . that a violation of § 1001 does not require that the false statement must actually have been submitted *to* a department or agency of the United States, but rather that it was *contemplated* that the statement was to be utilized in a matter which was within the jurisdiction of such department or agency.

*Id.* at 1227 (emphasis added) (upholding a conviction under § 1001

where the defendant provided false billing affidavits to the City of New York, rather than directly to the federal Department of Housing and Urban Development, because the affidavit stated that the defendant knew the City would rely on it to seek reimbursement from HUD and would make the affidavit available to HUD).

Similarly, the Eighth Circuit had held that § 1001 applies not only to a false statement or writing presented to a federal agency, but also to "any knowing making or using of such a statement or document *in intended relationship* to a matter that is within the jurisdiction of the department or agency." *Ebeling v. United States*, 248 F2d 429, 434 (8th Cir. 1957) (emphasis added).

> In more explicit terms, we are of the opinion that it constitutes a violation of § 1001, for anyone willfully to make or use a false writing or document, knowing that it contains a false, fictitious or fraudulent statement or entry, and *intending that it shall bear a relation or purpose* as to some matter which is within the jurisdiction of a department or agency of the United States. . . .

Id. (emphasis added). See also *United States v. Hooper*, 596 F2d 219, 223 (7th Cir. 1979) (upholding a § 1001 jury instruction that relied on *Ebeling* to charge that the false statements or documents must be "used in some intended relationship to a matter within the jurisdiction of the department"); *Lowe v. United States*, 141 F2d 1005, 1005 (5th Cir. 1944) (reversing the § 1001 conviction of a shipyard employee who made false statements to his private employer, who would be reimbursed by the United States Maritime Commission, where the employee was apparently unaware of that arrangement and, "[i]nsofar as the employee was concerned, every aspect of his employment was exactly the same as it would have been had there been no contract with any government agency of any kind"). We think these decisions construing § 1001 are a good guide to how the General Assembly meant the statute it modeled on that law to be understood.

We recognize that in 1980 the former Fifth Circuit took a different view of § 1001. See *United States v. Baker*, 626 F2d 512, 515-516 (5th Cir. 1980). After noting that "[t]he statutory language is simply unclear" as to whether the "knowingly and willfully" requirement modifies the jurisdictional element, the court looked to the "policy and purposes of the law" and concluded that "it is irrelevant whether defendant knew that his intentionally false statements might eventually influence a federal agency." Id. at 515-516 & n. 7. And four years later, the United States Supreme Court, in a 5-4 decision, held that "proof of actual knowledge of federal agency jurisdiction is not required under § 1001." See

*Yermian*, 468 U. S. at 75 (relying on the plain language of that statute — with the jurisdiction clause placed at the introduction due to the 1948 revision, see footnote 3 above — and its legislative history).

But these decisions do not change our conclusion, for several reasons. First, they came *after* the enactment of Ga. Code Ann. § 26-2408, the predecessor to OCGA § 16-10-20, in 1976 and its last substantive amendment in 1979 and therefore could not be judicial interpretations the General Assembly considered in drafting the Georgia statute. Second, the subsequent opinions relied heavily on the legislative history and policy of § 1001 to construe that statute. See *Yermian*, 468 U. S. at 70-74. We have been offered no legislative history of § 16-10-20, and while we often presume that the General Assembly was aware of how courts had previously interpreted the language it included in a statute, we have not presumed that the Georgia legislature is aware of, much less relies on, the legislative history or the "purpose" of other sovereigns' statutes that it uses as a model.

Third, the majority in *Yermian* emphasized that it was deciding only that a defendant was not required to have "actual knowledge" that his false statements came within an agency's jurisdiction, expressly reserving the question whether some lesser degree of mens rea was required. See *Yermian*, 468 U. S. at 68, n. 5 (noting that "[t]he Government never objected to the District Court's instruction requiring proof that respondent reasonably *should have known* that his false statements were made within the jurisdiction of a federal agency," so that "in this case the Government was required to prove that federal agency jurisdiction was reasonably foreseeable" (emphasis in original)), 75, n. 14 (stating that the fact Yermian's jury had to find that "federal agency jurisdiction was reasonably foreseeable by the defendant" helped to "preclude[ ] the possibility that criminal penalties were imposed on the basis of innocent conduct"). The dissent also emphasized the point:

> Seemingly aware of the broad range of conduct that § 1001 could sweep within its scope under today's interpretation, the Court apparently does not hold that the words "in any matter within the jurisdiction of any department or agency of the United States" are jurisdictional words *only* and that *no* state of mind is required with respect to federal agency involvement. Instead, the Court suggests that some lesser state of mind may well be required in § 1001 prosecutions in order to prevent the statute from becoming a "trap for the unwary."

*Yermian*, 468 U. S. at 83 (Rehnquist, J., dissenting) (citation omitted; emphasis in original). See also id. at 82 (explaining that it seems

"highly unlikely" that Congress "intended to criminalize the making of even the most casual false statements so long as they turned out, unbeknownst to their maker, to be material to some federal agency function. [This] interpretation would substantially extend the scope of the statute even to reach, for example, false statements privately made to a neighbor if the neighbor then uses those statements in connection with his work for a federal agency.").

Finally, while pre-1979 judicial interpretations of 18 USC § 1001 suggest how we should read the parallel language the General Assembly put in OCGA § 16-10-20, federal court interpretations of a federal statute do not, in the end, bind this Court's interpretation of a Georgia statute. At a minimum, the decisions in cases like *Candella, Ebeling, Hooper*, and *Lowe*, as well as the view of four Justices of the United States Supreme Court in *Yermian*, show that it is at least *reasonable* to interpret § 16-10-20 to require the defendant to have some knowledge and intent with respect to the potential that a state or local government agency will respond to his false statement. And when the alternative construction would lead to substantial constitutional concerns, that is enough. See *Marcus*, 249 Ga. at 345. To the extent that these tools of statutory construction leave doubt about the meaning of the statute, moreover, the rule of lenity would require us to interpret it in favor of the defendant. See *Harris v. State*, 286 Ga. 245, 253 (686 SE2d 777) (2009); *Yermian*, 468 U. S. at 76, 83 (Rehnquist, J., dissenting).

Accordingly, we hold that OCGA § 16-10-20 requires proof that the defendant knowingly and willfully made a false statement *and* that he knowingly and willfully did so in a matter within the jurisdiction of a state or local department or agency. We reiterate that this does not require proof that the defendant made the false statement directly to the government agency, although in such cases it would normally be undisputed that the defendant knew and intended that the statement came within the jurisdiction of the agency. However, the statute does require the defendant to have made the false statement in some intended relationship to a matter within the state or local agency's jurisdiction, that is, to have contemplated that it would come to the attention of an agency with the authority to act on it. Our holding is consistent with the only Court of Appeals' decision in this area, which properly rejected the defendant's "assert[ion] that [§ 16-10-20] is designed to punish only those false statements made directly to a department or agency of state or local government." *Tesler*, 295 Ga. App. at 575. The *Tesler* majority cited and quoted the passages from *Candella* and *Hooper* that undergird our holding (although it also cited some post-1979 federal cases). See 295 Ga. App. at 576. Moreover, Judge Blackburn's special concurrence did not suggest that no knowledge of govern-

ment jurisdiction is required; to the contrary, he believed that the false statement at issue needed to be made directly to a state agency to avoid the sort of overcriminalization concerns that our construction of the statute also seeks to preclude. See id. at 578-579.

(c) When OCGA § 16-10-20 is construed as we conclude it should be, Haley's constitutional claims dissipate. It is debatable whether a false statement, standing alone, lacks any First Amendment protection, as discussed at length by the majority and dissenting opinions in *United States v. Alvarez*, 617 F3d 1198 (9th Cir. 2010). However, a knowingly and willfully false statement that is made knowingly and willfully in a matter within a government agency's jurisdiction is a lie that threatens to deceive and thereby harm the government, if only because the government may need to expend time and resources to determine the truth. See id. at 1212-1213. Such harm would not be self-inflicted by the government, as might be said if an agency reached out to act on a false statement someone made without any expectation that it would reach the government. Instead, the State may lawfully punish such a course of potentially deceptive and injurious conduct. See *Cox v. Louisiana*, 379 U. S. 536, 555 (85 SC 453, 13 LE2d 471) (1965) (" '[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' " (citation omitted)). Thus, Haley acknowledges that § 16-10-20 would be constitutional if the false statement is "intended for a government agency or department and/or . . . made with the intent of causing some harm." We believe our construction of the statute ensures that result. Likewise, as properly construed, § 16-10-20 may only be applied to conduct that persons of common intelligence would know was wrongful because it could result in harm to the government.

For these reasons, we reject Haley's facial and as-applied First Amendment challenges to OCGA § 16-10-20.

3. Haley contends that the evidence at trial presented was insufficient to support his OCGA § 16-10-20 conviction.

(a) Haley argues primarily that the State failed to prove that the false statement alleged in the indictment was in fact made "in a matter within the jurisdiction of the GBI." While acknowledging that Agent Rothwell testified that the GBI had an active investigation of the Tara Grinstead case when the first "catchmekiller" video was posted, Haley notes that the agent also testified that the GBI is an assisting agency that becomes involved in investigations when requested by other agencies. Haley claims that the GBI therefore had no "power to act upon" the false statement alleged in the indictment — the killing of 16 unidentified people. *Tesler*, 295 Ga. App. at 577 (punctuation omitted).

OCGA § 35-3-8.1 authorizes state or local officials to request the GBI to assist local agencies in the "detection or apprehension of persons violating the criminal laws of this state, any other state, or the United States." But we have not interpreted that statute to strictly limit the GBI's law enforcement authority. See *Owens v. State*, 251 Ga. 313, 318 (305 SE2d 102) (1983) ("We do not read OCGA § 35-3-13 . . . as being the exclusive list of who may request investigative assistance from the GBI. GBI officers are peace officers with the duty to assist and cooperate in the prevention and detection of violations of the laws of this state and the officers here were within the scope of their authority."). Furthermore, the GBI has very broad authority to acquire and act on information about missing persons and to exchange such information with appropriate officials of other states and the federal government. See OCGA § 35-3-4 (a) ("It shall be the duty of the bureau to . . . (7) Acquire, collect, classify, and preserve immediately any information which would assist in the location of any missing person, . . . [and] (8) Exchange such records and information . . . with, and for the official use of, authorized officials of the federal government, the states, cities, counties, and penal and other institutions.").

The evidence here showed that the GBI was actively investigating the Tara Grinstead missing person case. And because the first two "catchmekiller" videos contained "clues" referencing a Georgia missing person and the location of a missing person's body parts in Augusta, and it was then determined that the computer from which the videos were being posted was in Georgia, the jury could also reasonably infer that the other missing person cases referenced in the first video would have a Georgia connection, giving the GBI jurisdiction (and good reason) to investigate them.

To the extent that Haley is contending that Count 2 of the indictment failed even to specify that Tara Grinstead was one of the 16 people supposedly killed by the "catchmekiller," he is essentially arguing that there was a fatal variance between the allegations in the indictment and the proof at trial. But Georgia courts " 'no longer employ an overly technical application of the fatal variance rule, focusing instead on materiality.' " *Roscoe v. State*, 288 Ga. 775, 776 (707 SE2d 90) (2011) (citation omitted). The allegations in the indictment sufficiently informed Haley of the charge against him so as to enable him to prepare a defense, there is no claim that he was surprised at trial, and there is no danger that he could be prosecuted again for the same offense. Any variance, therefore, was not fatal. See id.

(b) We also conclude that the evidence at trial was sufficient to prove the other elements of the OCGA § 16-10-20 violation. Haley admitted that he knowingly and willfully made the false statement at

issue. With regard to whether Haley knew and intended that the false statement in his first video would be in a matter within the jurisdiction of a state or local government agency, as discussed in Division 2 above, we note first that — even without the benefit of our holding today — the trial court properly charged the jury on that element of § 16-10-20. The jury was instructed that the State "must prove by evidence beyond a reasonable doubt that a defendant made a false statement or representation *knowingly and willfully in some intended relationship to* a matter within the jurisdiction of the governmental agency." (Emphasis added.) Moreover, the trial court also charged that the State had to prove the alleged false statement was "material to the decisions of the governmental agency alleged to have been involved," even though this Court has held that materiality is not an element of the false statements component of § 16-10-20. See *Dorsey v. State*, 279 Ga. 534, 543 (615 SE2d 512) (2005). Compare 18 USC § 1001 (a) (2) (current version now making materiality an express element of the false statement prong). This unnecessary instruction provided further protection to Haley against conviction for an innocent or unimportant false statement.

Against this backdrop, the evidence, as more fully recounted in Division 1 above, was sufficient to prove that Haley knew and intended that his false statement as the "catchmekiller" would come to the attention of a state or local government agency in Georgia that had the power to act on it. Most telling are Haley's own words in the videos. The first video included many comments revealing Haley's awareness and expectation that the matters he was discussing — the purported serial killing of 16 missing persons, including a Georgia woman — involved law enforcement investigations and that the police would try to identify and catch the "catchmekiller." The second video — in which the "clue" related to a murder victim's body parts that could be found near an Augusta, Georgia, parkway — asserts that a Florida FBI agent had responded to the first video, showing that Haley understood that law enforcement agencies might well take action as a result of the false information he was posting. Given the Georgia connections of both videos, the jury could reasonably infer that Haley contemplated that a Georgia law enforcement agency — like the GBI — would learn of and act on his intentionally deceptive statement about the commission of exceptionally serious crimes.

Moreover, the videos refer to missing person cases that had received media attention, and the jury could also reasonably infer that Haley knew that such publicized cases are normally the subject of investigations by local, state, and federal law enforcement agencies. Indeed, Haley admitted that he obtained some of the information about Tara Grinstead's case from a database of missing persons

and news reports, and it would be reasonable to believe that such sources would also include information from and about the investigations that customarily accompany such cases. This inference would be strengthened in this case, because the jury also heard evidence that, just two or three months before the first video appeared with a "clue" about Tara Grinstead, her case was the subject of a national television show featuring the GBI agent investigating the case. Finally, Haley's brother's girlfriend testified that, after Haley posted the first video, he said "someone might be coming to the house," by which, the jury could reasonably infer, Haley revealed his concern that his false statement would reach Georgia law enforcement, who would act to track it back to the house in Hall County from which Haley had posted the videos in their effort to find the "catchmekiller." The witness said that Haley had a joking tone, but the jury was not required to believe that — or it could have believed that Haley realized that his "game" had, just as his video predicted, come to the attention of a law enforcement agency, leaving him to try to laugh off the serious predicament he was in.

For these reasons, the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational jury to find Haley guilty beyond a reasonable doubt of violating OCGA § 16-10-20. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)).

4. We conclude, however, that evidence was not sufficient to support Haley's conviction for violating OCGA § 16-10-94. The tampering with evidence statute provides, in relevant part:

> A person commits the offense of tampering with evidence when, with the intent to prevent the apprehension or cause the wrongful apprehension of any person or to obstruct the prosecution or defense of any person, he knowingly destroys, alters, conceals, or disguises physical evidence or makes, devises, prepares or plants false evidence.

OCGA § 16-10-94 (a).

Haley was indicted for violating this statute by making and disseminating the first YouTube video "with the intent to prevent the apprehension of and to obstruct the prosecution of another person." Thus, to convict Haley, the State had to prove his specific intent to prevent the apprehension and obstruct the prosecution of some other person. See *Teasley v. State*, 288 Ga. 468, 470 (704 SE2d 800) (2010) (explaining that the tampering with evidence count of

the indictment charged the defendant with having "the specific intent of obstructing his prosecution"); *Merritt v. State*, 285 Ga. 778, 780 (683 SE2d 855) (2009) ("OCGA § 16-10-94 (a) clearly states that intent is a necessary element of the crime. . . ."). The State proved that video prompted a law enforcement agency to investigate Haley (as he had expected), wasted the GBI's time and resources, and caused pain to the Grinstead and Kesse families. But the evidence did not prove beyond a reasonable doubt that Haley created and posted the video with the specific intent to prevent the apprehension or obstruct the prosecution of some other person. See *Merritt*, 285 Ga. at 780 (reversing conviction for tampering with evidence in the defendant's own case where the evidence of intent to frustrate that prosecution was insufficient). We therefore reverse Haley's conviction under OCGA § 16-10-94.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Hunstein, C. J., and Benham and Thompson, JJ., who concur in Divisions 1, 3, and 4 and in the judgment.*

DECIDED JULY 8, 2011.

*Kristin I. Jordan, Brett M. Willis*, for appellant.
*Lee Darragh, District Attorney, Jennifer D. Hart, Conley J. Greer, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.
*Kilpatrick Stockton, Joseph M. Beck, William A. Pequignot, Bondurant, Mixson & Elmore, Emmet J. Bondurant*, amici curiae.