In the Supreme Court of Georgia


Decided:   February 1, 2016


S15A1618.  SEARS v. THE STATE.


NAHMIAS, Justice.

Appellant Kevin Sears was convicted of malice murder for the shooting death of William Preston Cowart and aggravated assault with a deadly weapon against Cowart's fiancée, Nancy Lorinda Hilliard.  Appellant was also charged with simple assault against Bridget Cowart (Bridget), who was Appellant's girlfriend and Cowart's niece, but the jury acquitted Appellant of that charge. Appellant contends that the evidence was insufficient to support his convictions and that there was a fatal variance between the allegations of the indictment and the proof at trial with respect to the aggravated assault charge.  We affirm.[1]

_____

[1]  The crimes occurred shortly after midnight on June 26, 2011.  On July 26, 2011, a Ware County grand jury indicted Appellant for malice murder, felony murder, aggravated assault with a deadly weapon, and simple assault.  At a trial on June 21-22, 2012, the jury acquitted Appellant of simple assault but found him guilty of malice murder and aggravated assault; the verdict form framed the malice murder and felony murder charges as alternatives.  On July 9, 2012, the trial court sentenced Appellant to serve life in prison for the malice murder and 20 consecutive years for the aggravated assault.  On the same day, Appellant filed a motion for new trial.  On March 21, 2013, the court held a hearing and then summarily denied the motion.

On March 26, 2013, Appellant filed a notice of appeal.  More than a year later, the record was transmitted to this Court.  On July 10, 2014, the case was docketed here and a docketing notice was

1. (a) Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On Saturday night, June 25, 2011, Appellant and Bridget went out drinking with Cowart and Hilliard. As the night went on, the two couples split up, with Bridget driving Appellant in her car to a party at his sister's house and Cowart driving Hilliard in Hilliard's SUV to a different party. Appellant's sister later asked him to leave her house because he was being rowdy.

Appellant and Bridget had made plans with Cowart and Hilliard to meet back up at a convenience store. On the way there, Appellant and Bridget began arguing, because Appellant wanted to drive. Appellant, who had been smoking marijuana that evening in addition to drinking, tried to grab the steering wheel from Bridget, and she punched him hard in the mouth. Bridget stopped at the

sent electronically to Appellant's attorney, Alan Tucker, at Tucker's email address on file with the Court. Tucker did not submit a brief on Appellant's behalf. On August 5, 2014, the Court entered an order directing Appellant to file a brief on the merits of the case no later than August 15 and warning that failure to do so could result in dismissal of the appeal. Still no brief was filed, and on September 8, 2014, we dismissed the appeal for failure to comply with the Court's order to file a brief. On February 5, 2015, Tucker filed a motion for out-of-time appeal in the trial court on Appellant's behalf, claiming that he had not received the docketing notice from this Court because he had stopped using the email address that he provided due to issues with junk mail, spam, and associated computer viruses. The State did not object to the motion, which the trial court granted on April 16, 2015. On May 4, 2015, Appellant filed a new notice of appeal, and the case was docketed in this Court for the September 2015 term and submitted for decision on the briefs.

convenience store to wait for Cowart and Hilliard, but then decided to take Appellant to the house where he lived with his mother. Appellant and Bridget rode in silence to his house, except for when Bridget told him that she was going to come inside only to use the bathroom and then leave.

As Cowart and Hilliard were arriving at the convenience store, they saw Bridget speed out of the parking lot in the direction of Appellant's house. Concerned, they drove to Appellant's house, where Cowart sent a text message to Bridget saying that he was outside and also honked the horn several times. There was no response, however, and the house was dark, so Cowart and Hilliard decided to drive home. Meanwhile, inside the house, Appellant and Bridget were arguing again and had begun physically fighting. Appellant told Bridget that he was going to kill her, and she managed to text the word "Help" to Cowart's cellphone. Cowart turned around and returned to Appellant's house, arriving within a few minutes.

Cowart parked the SUV in Appellant's driveway next to Bridget's car, left the keys in the ignition and the headlights on, and ran up the front steps and into the house with Hilliard. They could hear Bridget screaming, and they followed the screams to Appellant's bedroom in the back, where they found Appellant

and Bridget fighting on the bed. Cowart intervened, and Bridget got up and ran past him and Hilliard into the hallway. Appellant tried to get up to go after Bridget, but Cowart pushed him back down on the bed, and the two men began fighting. Appellant put Cowart into a headlock and started choking him. Hilliard was afraid that Appellant was going to choke Cowart to death, so she punched Appellant hard in the face several times, knocking out one of his front teeth. At that point, Appellant released Cowart, who got up and said "let's go." Bridget ran out of the house, followed by Hilliard and then Cowart.

Appellant got up, grabbed his deer rifle, and chased after them. When Appellant reached the front porch, Bridget was in her car and had started backing out of the driveway, Cowart was getting into the driver's seat of the SUV, and Hilliard had her hand on the handle of the front passenger-side door. Hilliard saw Appellant exit the house, stop on the front steps, and point the rifle towards her and Cowart. She then heard Appellant fire a single shot and dropped to the ground beside the SUV to avoid being hit. While on the ground, Hilliard could see Appellant's feet, and she watched as he walked quickly to the driver's side of the SUV and used the bolt-action rifle to fire four shots through the open door into Cowart, killing him. After the last shot was fired, Appellant

4

walked up to Cowart and began punching Cowart in the face with his right hand while holding the rifle to his side with his left hand.

Appellant then walked around to the rear of the SUV. Just then, Appellant's mother pulled her car into the driveway and parked along the driver's side of the SUV. Appellant jumped up on the hood of her car, began hitting the windshield, and then knocked out the front driver-side door window. While Appellant was attacking his mother's car, Hilliard got up, saw Cowart slumped over the steering wheel in the SUV, and ran to the trailer behind Appellant's house to get help. Appellant calmed down, took his rifle inside the house and laid it on his mother's bed, came back outside, and leaned up against the back of his mother's car.

Two neighbors awakened by the gunfire had told their wives to call 911; they called across the street to Appellant to see if they could check on the man in the SUV. Appellant said that would be okay and that he no longer had the rifle. The two men walked across the street and introduced themselves to Appellant, who appeared to be calm. Appellant repeatedly said that there was no need to check on Cowart because he was dead, and that Appellant had shot him with a rifle.

5

By this point, Bridget had come back and parked her car across the street from Appellant's house. She was yelling, "Oh, my God; he's been shot; he's been shot," and Appellant was yelling across the street to her, "this is your fault; this is all your damn fault . . . . I told you if you called him I was going to kill the m*****f*****." When sheriff's deputies arrived at the scene a short time later, Appellant admitted that he shot Cowart.

An autopsy revealed that Cowart had bruising on his head and four gunshot wounds to his head, neck, left arm, and chest, each of which would have been fatal and one of which struck him in the heart and caused his death immediately. A firearms examiner confirmed that projectiles removed from Cowart's body and four shell casings found on the ground beside the SUV were fired from Appellant's rifle, which was recovered from his mother's bedroom.

(b) Appellant contends that the evidence was legally insufficient to support his conviction for malice murder and showed that he was guilty only of voluntary manslaughter. When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above authorized the jury to find that after Cowart helped Bridget escape her fight with Appellant and tried to leave with her, Appellant began fighting with Cowart, putting him in a

6

headlock and choking him until Hilliard punched Appellant in the face to get him to release Cowart. Cowart immediately got up, said "let's go," ran out of the house behind Bridget and Hilliard, and got into the driver's seat of Hilliard's SUV to leave. Instead of allowing Cowart and the two women to drive away, Appellant got up from his bed, grabbed his deer rifle, and chased after them, stopping on his front steps to fire a shot towards the SUV. He then went down the stairs and around to the driver's side of the SUV, where he used his bolt-action rifle to fire four shots into Cowart from close range, killing him. Based on this evidence, the jury, which was properly instructed on malice murder and voluntary manslaughter, was entitled to reject Appellant's claim that when he killed Cowart, he was "act[ing] solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a). See, e.g., Wigfall v. State, 274 Ga. 672, 672-673 (558 SE2d 389) (2002) (holding that the jury was authorized to find the defendant guilty of malice murder rather than voluntary manslaughter where the victim made unwanted sexual advances toward the defendant's mother, refused to leave after being asked, and cursed at and hit the defendant with a metal chair, and the defendant then got a gun from her purse,

7

went outside, and shot and killed the victim as he was walking away); Baldwin v. State, 263 Ga. 524, 526 (435 SE2d 926) (1993) (affirming the jury's verdict of malice murder instead of voluntary manslaughter where the evidence "would authorize a finding that, after engaging in a verbal and physical altercation with the victim, appellant pulled a gun and shot the victim as he was attempting to flee").

The evidence also supported a finding that there was "an interval between the provocation [i.e., the fight in the bedroom] and the killing sufficient for the voice of reason and humanity to be heard," in which case the voluntary manslaughter statute instructs that "the killing shall be attributed to deliberate revenge and be punished as murder." OCGA § 16-5-2 (a). See, e.g., Lowe v. State, 267 Ga. 410, 411 (478 SE2d 762) (1996) (holding that "the jury was authorized to find that [the defendant's] fatal shooting of the unarmed victim was not the result of sudden and irresistible heat of passion, but was a deliberate act of revenge committed after a sufficient 'cooling off' period," where the victim confronted the defendant and an initial exchange of words escalated into a fist fight, the defendant broke away and fled, and the victim chased and caught the defendant and resumed hitting him before beginning to retreat toward an

8

awaiting car, and the defendant, whose girlfriend handed him a gun, then ran after and confronted the unarmed victim, shot him in the arm, stood over him as he pleaded for his life, and shot him in the abdomen, killing him).  Accordingly, the evidence was legally sufficient to support Appellant's malice murder conviction.  See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); McNair v. State, 296 Ga. 181, 182 (766 SE2d 45) (2014) (holding that whether the evidence supports a verdict of malice murder as opposed to voluntary manslaughter is a jury question).  See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

(c)    Appellant also contends that the evidence was insufficient to support his conviction for the aggravated assault of Hilliard.  The trial court properly instructed the jury that a person commits aggravated assault when he "assaults another person with a deadly weapon," that a person has committed an assault if he "intentionally committed an act that placed the alleged victim in the reasonable fear of immediately receiving a violent injury," and that "[a] firearm, when used as such, is a deadly weapon as a matter of law."  See OCGA §§ 16-5-

9

20 (a) (2), 16-5-21 (b) (2); <u>Futch v. State</u>, 286 Ga. 378, 381-382 (687 SE2d 805) (2010). Appellant does not take issue with these legal principles. Instead, he claims that the evidence showed that Hilliard did not see him shoot at her and that she did not know where he was shooting or aiming, because after the first shot, she was hiding under the SUV and could not see anything but his feet. However, the evidence viewed in the light most favorable to the verdict showed that Hilliard saw Appellant pointing the rifle in her vicinity, that he fired the gun in that direction, and that she heard the shot and fell to the ground to avoid being shot at again. Moreover, Hilliard testified that she was "scared" and "fearful of being shot . . . or struck" when she was lying on the ground next to SUV and Appellant was firing into the vehicle.

This evidence was clearly sufficient to support a jury finding that Appellant intentionally placed Hilliard in reasonable apprehension of immediately receiving a violent injury from a deadly weapon. See <u>Tiller v. State</u>, 267 Ga. 888, 890 (485 SE2d 720) (1997) (upholding an aggravated assault conviction where "the jury was authorized to find that [the victim] was placed in reasonable apprehension of immediately receiving a violent injury, since he heard the shot and fell to the ground to avoid being shot at again"),

overruled on other grounds by <u>Dunagan v. State</u>, 269 Ga. 590, 593 n.3 (502 SE2d 726) (1998). Thus, the evidence was legally sufficient to support the aggravated assault conviction. See <u>Jackson</u>, 443 U.S. at 319; <u>Vega</u>, 285 Ga. at 33.

2.    Finally, Appellant argues that there was a fatal variance between the allegations of the indictment and the proof at trial with respect to the aggravated assault charge, because the indictment alleged that he discharged his rifle "several times into and toward a vehicle that [Hilliard] was attempting to get into," but, Appellant asserts, there was no evidence at trial that Hilliard was attempting to enter her SUV when the shots were fired. Appellant's description of the evidence is incorrect, however, because Hilliard testified that she had her hand on the door handle of the SUV and "had just lifted [the handle] up" when Appellant fired the first shot from his front steps. Thus, the factual premise for Appellant's argument is faulty.

In any event, "Georgia courts no longer employ an overly technical application of the fatal variance rule, focusing instead on materiality." <u>Haley v. State</u>, 289 Ga. 515, 529 (712 SE2d 838) (2011) (citation and punctuation omitted). The allegations of the indictment sufficiently informed Appellant of

the aggravated assault charge against him so as to enable him to prepare a defense; there is no claim that he was surprised by the proof at trial; and there is no danger that he could be prosecuted again for the same offense. Accordingly, any variance was not fatal to his conviction. See id.

Judgment affirmed. All the Justices concur.