NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 30, 2025

S25A0573. ROBINSON v. THE STATE.

MCMILLIAN, Justice.

Spencer Robinson appeals from his convictions for felony murder and related crimes arising from the shooting death of Darious Anderson and aggravated assault of Stanley Winston.[1]

---

[1] The crimes occurred on October 28, 2015. On January 19, 2016, a DeKalb County grand jury indicted Robinson for malice murder (Count 1), felony murder (Count 2), aggravated assault of Anderson (Count 3), aggravated assault of Winston (Count 4), and possession of a firearm during the commission of a felony (Counts 5-6). At a trial held in September 2016, the jury found Robinson guilty of all counts except malice murder. On October 6, 2016, the trial court sentenced Robinson to serve life in prison for felony murder (Count 2), a consecutive 20-year term for the aggravated assault of Winston (Count 4), and a consecutive 5-year term for the firearm possession based on the aggravated assault of Anderson (Count 5); the remaining counts were merged for sentencing purposes. Although Count 6 should not have been merged into Count 5 because the counts involved two different victims, see *Silah v. State*, 315 Ga. 741, 758 (2023) ("If crimes are committed against different victims … they do not merge."), this sentencing error benefitted Robinson, and the State has not raised this error on cross-appeal. We decline to address the issue here. See *Dixon v. State*, 302 Ga. 691, 697–98 (2017).

Robinson timely filed a motion for new trial, which was amended through new counsel on August 2, 2024. Following a hearing, the trial court

Robinson argues that (1) the evidence was insufficient to sustain his conviction for aggravated assault against Winston; (2) the trial court committed plain error by not giving a charge on accomplice corroboration; (3) his trial counsel rendered ineffective assistance in three respects; and (4) the cumulative prejudice of these errors warrants a new trial. Because the evidence was sufficient; the trial court did not commit plain error; and we conclude that the only instance of possible deficient performance did not prejudice Robinson's defense, we affirm.

The evidence presented at trial showed that Anderson and Winston were both 15-year-old high school students. Winston testified that after school on October 28, 2015, Anderson showed him a revolver he planned to sell to someone known as "Jarvis." Anderson also showed Winston that the gun had four or five bullets in it. The two boys sought the assistance of 17-year-old Robinson (known as "Lil Boonk"), who lived across the street from Jarvis, to

denied the motion for new trial, as amended, on November 26, 2024. Robinson timely filed a notice of appeal, and his case was docketed to the April 2025 term of this Court. The case was orally argued on April 16, 2025.

sell the gun. Anderson walked over to Jarvis's house and knocked on the door, but no one came to the door. When they realized that Jarvis was not home, Robinson suggested that he hold the gun, and Anderson acquiesced. The three boys then walked up the street, and Robinson tried to sell the gun to several men without success.

The boys then decided to seek a trade with a local tattoo artist and walked to a short trail, known as "the cut," that connected two neighborhoods. As they were walking through the cut, Anderson asked Robinson for the gun back. Winston testified that "Lil Boonk pulled out the gun and he looked at it, then he pointed it at us." Robinson said, "[T]his s**t took on blood," which Winston understood to mean that Robinson was taking the gun and it no longer belonged to Anderson.

Anderson asked Robinson, "[Y]ou going to do me like this[?]" Robinson replied, "[Y]eah, ya'll get running before I start shooting." As Winston and Anderson ran away, Robinson immediately started shooting. Winston heard four or five shots, and Anderson said, "I got hit, I got shot." Anderson stopped at a house, told Winston to knock

3

on the door for help, and then dropped to the ground in the driveway. Winston held Anderson, telling him, "[Y]ou can't leave me right now, can't leave me."

Around 4:30 p.m., Ethelene Coleman called 911 to report that two teenage males were running towards her home when one of them collapsed on the sidewalk. Coleman testified that the boy who fell was staggering as he ran and that the second boy stayed with his friend the entire time while they waited for the police. When DeKalb County police officers arrived, Anderson was still alive but unresponsive and struggling to breathe. One of the responding officers testified that Winston was with Anderson, calling out his name to keep him conscious, begging him to stay with him, and asking him where he was shot.

Winston initially told officers that he and Anderson were walking through the woods when an unknown man came behind them and fired off four rounds from a revolver. When asked if there were words or a confrontation beforehand, Winston said no. Winston showed officers the path where the shooting occurred behind Leslie

4

Brook Drive. Winston described the shooter as short, with a "temp fade" haircut, and wearing blue Adidas pants with three stripes on the side and gold and diamond square earrings.

Another responding officer, who was nearby and had received a general description of the suspected shooter, went to the cut between the neighborhoods and saw a "male teen with dark colored pants with stripes on the side, shirt off, … walking towards the yellow house." After receiving additional information regarding the suspect's clothing, the officer made a U-turn, and the suspect, later identified as Robinson, "took off running." The officer pursued Robinson down an unfinished street until they reached a dead-end and then chased Robinson on foot until Robinson jumped over a wooden privacy fence.

Other officers were able to get to the other side of the fence and search the area on foot until they found Robinson hiding in the kudzu. Officers had to kick in a section of the fence to be able to effectuate the arrest. Later that evening, officers searched the cut, which was lined by thick brush and briar bushes, but the revolver

used in the shooting was never found. Detectives performed a gunshot residue ("GSR") kit on Robinson, which found no particles characteristic of GSR.[2]

The following day, Winston gave another statement to detectives. In that statement, Winston admitted that he and Anderson had gone to Robinson's house to sell a gun. Winston stated that Robinson threatened them and then fired the gun; he denied that Robinson ever tried to hand the gun to him. Winston explained at trial that he initially did not tell officers who had shot at them because he was afraid that he and Anderson would be charged with a crime for trying to sell the gun.

Robinson agreed to waive his rights under *Miranda*,[3] and in his custodial statement, Robinson initially claimed he did not know why officers were chasing him and denied any involvement in Anderson's shooting. Robinson continuously denied not only the

---

[2] Detectives did not perform a GSR kit on Winston. A GBI trace evidence expert testified that many factors affect how long GSR will remain on someone's hands, including how many times that person touches something after firing a weapon.

[3] See *Miranda v. Arizona*, 384 US 436 (1966).

6

shooting, but denied even hearing gunshots, denied knowing who got shot, and denied he was in the cut at all or saw anyone, let alone two other boys.

It was not until well into his interview with detectives that Robinson finally admitted he had known Anderson for quite some time and that Anderson and his friend had come to his house looking for help to sell a gun. Robinson admitted to going through the cut with the boys but claimed it was Winston who asked to see the gun. Robinson claimed the hammer was back, and stated, "I guess he grabbed the trigger or whatever and the gun went off," and stated that the gun went off two times. He claimed that Winston was "straight" and kept on going and that Anderson was "good," so he just went back home. When detectives asked where the gun was, he told them they would have to ask Anderson's friend. An audio recording of the interview was played for the jury at trial. One of the interviewing detectives testified that Robinson's version of events – that the gun somehow went off twice within seconds during a handoff – did not make sense because a revolver does not "just … go

7

off without pulling the trigger."

The medical examiner who performed the autopsy testified that Anderson sustained a single gunshot wound to his upper right buttock; the bullet passed through his iliac artery, which caused a fatal internal hemorrhage. The range between the gun muzzle and Anderson's sole gunshot wound was not determined, but the bullet path through Anderson's body was "in a straight line," "back to front sharply upwards." The medical examiner opined that the trajectory of the bullet indicated that Anderson turned away from the shooter and ducked for cover as he ran in an effort to make himself as small as possible by bending over to evade the bullet.

Robinson testified in his own defense at trial. He told the jury that, at the time of the shooting, he had known Anderson for three or four months. He had not met Winston before he and Anderson came to his house looking for help to sell the revolver. According to Robinson, he was going to help them sell it to "the Plug," who he described as "[t]he person that you sell stuff to," but the Plug was not interested in buying the gun.

Anderson then suggested they try to exchange the gun for tattoos. Robinson knew the "tattoo guy" and started through the cut with Anderson and Winston to the tattoo guy's house, which was a 35-to-40-minute walk from Robinson's street. According to Robinson, it was Winston, not Anderson, who asked to get the gun back from him. When he gave Winston the gun, the hammer was cocked, and the gun went off twice, with just seconds between the shots while Winston was holding the gun.[4] Robinson could not recall how Winston grabbed the gun. After the shots, Winston "jumped" and then just "[c]ontinued to walk" through the cut. The gunshot "startled" Robinson, so he walked back home to see his girlfriend because they had previously agreed to meet at that time.

---

[4] The testimony was as follows:
> Q. Okay. Do you remember – how you handed [the gun] to [Winston]?
> A. I just gave it to him like here you go.
> …
> Q. Okay. And what happens when you hand [Winston] the gun?
> A. It goes off.
> Q. What do you mean it goes off?
> A. It shot.
> Q. Did you see [Winston's] hand on anything?
> A. The gun.

Contrary to his prior statements to detectives, Robinson testified that he could not see where Anderson was or what he was doing at the time the shots were fired. He claimed that he ran from the police because he thought he had a narcotic pill in his possession, but he conceded that he could have thrown the pill away while he was running or hiding from the police.[5] He admitted that he lied to law enforcement throughout his interview, but claimed it was because he was scared and knew they were trying to tie him to a shooting.

Robinson's girlfriend, Alyssa Varner, testified that she was planning to meet Robinson at his house after school on the afternoon of the shooting. As she was exiting a bus near his house, she saw Robinson walking down the street. Varner continued walking towards Wesley Chapel Road and saw a police car before she reached Robinson. When the police car turned around in a cul-de-sac, Varner saw Robinson take off running through the cut.

---

[5] Officers located a pill in Robinson's pocket at the time he was detained, which Robinson told them was "Molly." GBI analysis later determined that this pill was not "any type of controlled substance."

1. Robinson first asserts that the evidence was insufficient as a matter of Georgia statutory law to sustain his conviction for aggravated assault against Winston. We are not persuaded.

Count 4 of the indictment alleged that Robinson "did make an assault upon the person of Stanley Winston with a deadly weapon, to wit: a handgun, by shooting toward Stanley Winston." Robinson argues that his conviction on this Count must be reversed because Winston did not testify that Robinson shot towards him and because Winston did not see Robinson pull the trigger. Thus, according to Robinson, the evidence was purely circumstantial and failed to exclude the reasonable theory of Robinson's innocence that there was not a second gunshot and that the sole gunshot was directed at Anderson. See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.").

However, "if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply in a

11

sufficiency analysis." *Troutman v. State*, 320 Ga. 489, 492 (2024).

Here, the evidence presented as to Count 4 was not entirely circumstantial. Winston's testimony was direct evidence that Robinson shot toward him and Anderson. Winston testified that, while he and Anderson were standing two feet from each other, Robinson told them to run before he started shooting. The two boys then fled together, and Robinson immediately fired at them four or five times. One of the bullets struck Anderson, and he told Winston that he had been shot. Thus, OCGA § 24-14-6 does not apply, and this claim fails.[6] See *Dillard v. State*, 321 Ga. 171, 175 (2025) (circumstantial evidence statute not applicable where eyewitness

---

[6] To the extent Robinson argues sufficiency as a matter of federal constitutional due process, we likewise conclude that Winston's testimony was sufficient to sustain Robinson's conviction for aggravated assault against Winston. See OCGA § 16-5-21(a)(2) ("A person commits the offense of aggravated assault when he or she assaults … [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in seriously bodily injury."); *Sears v. State*, 298 Ga. 400, 405 (2016) (rejecting appellant's argument that the victim did not see him shoot at her and did not know where he was aiming and concluding evidence was clearly sufficient where the victim testified that she saw appellant pointing a rifle in her vicinity, that he fired the gun in her direction, and that she heard the shot and fell to the ground to avoid being shot at again).

testimony was direct evidence).

2. Robinson also argues that the trial court committed plain error by omitting a jury charge on accomplice corroboration and instructing the jury that the testimony of a single witness was sufficient to establish a fact. According to Robinson, because he and Winston had originally agreed to sell the gun together, jury questions existed as to whether Winston was an accomplice in the aggravated assault and felony murder of Anderson. We disagree.

Robinson concedes that, because his trial counsel did not object to the trial court's omission of this jury charge, this claim is reviewed for plain error only. See *Baker v. State*, 319 Ga. 456, 461 (2024). To establish plain error, Robinson

> must show that the alleged instructional error was not affirmatively waived; was clear and obvious, rather than subject to reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Holloway v. State*, 320 Ga. 653, 659 (2025) (citation omitted). Because an appellant must satisfy all four elements of this test, establishing plain error is difficult, "as it should be." Id. (citation

13

omitted).

Under Georgia law, "[t]he testimony of a single witness is generally sufficient to establish a fact." OCGA § 24-14-8. However, "in certain cases, including … felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient" to establish a fact. Id. Instead, the accomplice's testimony must be corroborated by the testimony of another witness or by other corroborating circumstances. See id.; *Nabors v. State*, 320 Ga. 43, 51 (2024) (corroborating evidence "may be circumstantial, slight, and need not be of itself sufficient to warrant a conviction of the crime charged" (cleaned up)). "An accomplice is someone who shares a common criminal intent with the actual perpetrator of a crime." *Stripling v. State*, 304 Ga. 131, 136 (2018). And where "there is even slight evidence that a witness was the defendant's accomplice in any of the crimes charged, it is up to the jury to decide, under proper instructions, whether the witness was in fact an accomplice such that the witness's testimony must be corroborated under OCGA § 24-4-8." *Dillard*, 321 Ga. at 176.

Here, Robinson argues that the evidence supported a fair inference of Winston's accomplice status to the aggravated assault and murder charges because officers detained Winston at the scene; Winston was not forthcoming in his initial statement; and Robinson stated that Winston was the one who grabbed the trigger when Robinson handed him the cocked gun. However, this evidence does not support that Robinson and Winston shared a common criminal intent to commit aggravated assault and felony murder against Anderson; at most, this evidence would support Robinson's claim that Winston committed the crimes instead of Robinson. This does not constitute even slight evidence that Robinson and Winston acted as accomplices in committing the charged offenses. See *Dillard*, 321 Ga. at 176 ("However, where a defendant argues that a witness was his accomplice only in an uncharged crime, and there is no evidence that the witness was the defendant's accomplice in any of the charged crimes, an accomplice corroboration instruction is unwarranted."); *Thornton v. State*, 307 Ga. 121, 125 (2019) (accomplice corroboration charge not authorized where none of the

15

evidence supported an inference that the witness committed the crimes charged with appellant and defense theory at trial was that witness alone shot the victim; even if witness's actions amounted to slight evidence that witness committed the shooting, it was not evidence that they committed the crimes *together*). Because the evidence here did not call for an accomplice-corroboration charge, Robinson has not shown that its omission was a clear and obvious error. See *Baker v. State*, 320 Ga. 156, 162 (2024) ("If no one asked for an instruction on accomplice corroboration at trial and there was no evidence presented at trial that obviously called for giving that instruction, then a trial court does not commit a clear and obvious error by omitting it." (cleaned up)).

3. Robinson next argues that his trial counsel provided constitutionally ineffective assistance on three grounds. We are not persuaded.

To prevail on these claims, Robinson must show both deficient performance and resulting prejudice. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, Robinson

16

"must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." *Payne v. State*, 314 Ga. 322, 328–29 (2022) (citation and punctuation omitted). "The law recognizes a strong presumption that counsel performed reasonably," and Robinson "bears the burden of overcoming this presumption." *Blocker v. State*, 316 Ga. 568, 578 (2023) (citation and punctuation omitted). And to carry this burden, Robinson "must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (citation and punctuation omitted). To establish prejudice, Robinson "must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Zayas v. State*, 319 Ga. 402, 409 (2024) (citation and punctuation omitted). "The burden of proving ineffective assistance is a heavy one." *Smith v. State*, 303 Ga. 643, 646 (2018). If Robinson fails to establish either prong of this test, we need not address the other. See *Zayas*, 319 Ga. at 409.

(a) Robinson first claims that trial counsel failed to recognize the distinction between "unlawful act" involuntary manslaughter, OCGA § 16-5-3(a),[7] and "unlawful manner" involuntary manslaughter, OCGA § 16-5-3(b),[8] and that after the trial court rejected his original request under subsection (b), counsel should have pivoted his request to subsection (a). Robinson argues that an unlawful act involuntary manslaughter charge should have been requested because he told detectives that he had possession of the gun and that the gun went off when Winston grabbed the trigger

---

[7] OCGA § 16-5-3(a) provides:

A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. A person who commits the offense of involuntary manslaughter in the commission of an unlawful act, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years.

[8] OCGA § 16-5-3(b) provides:

A person commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner when he causes the death of another human being without any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm. A person who commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner, upon conviction thereof, shall be punished as for a misdemeanor.

18

and Anderson was shot. According to Robinson, this constitutes slight evidence that Robinson committed underage possession of a gun, a misdemeanor under OCGA § 16-11-132(b),[9] and that Anderson's death was caused "by the commission of an unlawful act other than a felony."

During the charge conference, trial counsel asked for misdemeanor involuntary manslaughter predicated on carrying a concealed weapon or possession of a firearm without a license. The State responded that, because it is unlawful for anyone under the age of 18 to possess a handgun, misdemeanor involuntary manslaughter was inapplicable. The State also argued that the evidence showed either that Robinson deliberately shot at Anderson or that Robinson was not even touching the gun when it went off, such that no theory of involuntary manslaughter would apply. The trial court agreed and declined to give an involuntary manslaughter

---

[9] This statute provides that "it shall be unlawful for any person under the age of 18 years to possess or have under such person's control a handgun. A person convicted of a first violation of this subsection shall be guilty of a misdemeanor[.]" OCGA § 16-11-132(b).

charge based on the facts as presented at trial.

At the motion for new trial hearing, counsel testified that, after consultation with Robinson, he requested involuntary manslaughter as a lesser offense and argued for a jury charge regarding misdemeanor involuntary manslaughter. Counsel denied having a strategic reason for failing to request a charge on felony involuntary manslaughter and testified that he could not "recall why [he] got stuck on the misdemeanor involuntary manslaughter" and could not "say why [he] didn't pivot." In its order denying the motion for new trial, the trial court held that Robinson "failed to point out even slight evidence that would have supported a lesser included offense of Involuntary Manslaughter under any theory of guilt."

We first note that, despite trial counsel's testimony that he did not act strategically in this regard, "we are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct." *Moulder v. State*, 317 Ga. 43, 52 n.14 (2023) (cleaned up). Turning to the charge at issue here, we have explained that the offense of

involuntary manslaughter can be committed in two different ways: (1) "causing the death of another without any intention to do so by the commission of an unlawful act other than a felony" or (2) "by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm." *McIver v. State*, 314 Ga. 109, 114 (2022) (citations and punctuation omitted). Here, because of his age, there was no lawful way for Robinson to be in possession of the gun. See OCGA § 16-11-132(b). Thus, the only option was a charge under OCGA § 16-5-3(a).

Pretermitting whether slight evidence supported a charge on unlawful act involuntary manslaughter predicated on underage possession of a gun and counsel performed deficiently in failing to request the charge, Robinson has not established the requisite prejudice. Robinson's actions in running from officers, hiding in the kudzu to evade officers, and lying repeatedly to detectives about his whereabouts and his role in the shooting strongly corroborated Winston's testimony that Robinson *intentionally* shot at him and Anderson. And the only evidence supporting that Winston shot

21

Anderson after taking the gun was Robinson's self-serving testimony. Accordingly, this claim of ineffective assistance fails. See *Barrett v. State*, 292 Ga. 160, 178–79 (2012) (no prejudice shown from counsel's failure to request a charge where defendant's own testimony would not support the charge); *Hill v. State*, 290 Ga. 493, 500 (2012) (no prejudice where evidence of guilt was overwhelming and appellant failed to establish how omitted jury charge would have raised a reasonable probability that the outcome of the case would have been different).

(b) Robinson next argues that trial counsel failed to request jury charges for reckless conduct[10] and pointing a pistol at another[11] as lesser offenses for Counts 3 (aggravated assault of Anderson) and 4 (aggravated assault of Winston) and as predicate misdemeanors

---

[10] Under OCGA § 16-5-60(b), one commits misdemeanor reckless conduct when he "causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his … act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

[11] Under OCGA § 16-11-102, "[a] person is guilty of a misdemeanor when he intentionally and without legal justification points or aims a gun or pistol at another, whether the gun or pistol is loaded or unloaded."

for unlawful act involuntary manslaughter.

At the motion for new trial hearing, counsel testified that he had no strategic reason for failing to request jury charges on these misdemeanors. The trial court held that Robinson failed to show deficient performance on the grounds that reckless conduct and pointing a pistol at another were not lesser offenses of aggravated assault and were not supported by the evidence.

(i) *Reckless Conduct*

Robinson argues that slight evidence was presented to warrant a reckless conduct charge because he testified at trial that he handed a revolver to Winston, who was 15 years old at the time, while the gun's hammer was cocked. See *McIver*, 314 Ga. at 139–40 (noting that it was for the jury to decide whether appellant's handling of a loaded revolver that was resting on his lap while he was sleeping in the backseat of a moving car was criminally negligent in manner or amounted to reckless conduct); *Soto v. State*, 303 Ga. 517, 521 (2018) (explaining that reckless conduct is an act of criminal negligence that causes bodily harm or endangers the bodily safety of another

23

and may be a lesser included offense of aggravated assault and that a charge on reckless conduct may be warranted where there is evidence that the defendant acted negligently).

Pretermitting whether slight evidence warranted the giving of this charge and that counsel was deficient in failing to request it, Robinson has not shown that such omission prejudiced him. As explained above, Robinson's actions in running from officers, hiding in the kudzu to evade officers, and lying repeatedly to detectives about his whereabouts and his role in the shooting strongly corroborated Winston's testimony that Robinson intentionally shot at him and Anderson. In contrast, any evidence that Robinson acted with criminal negligence in handling the gun was weak. Even when Robinson eventually admitted that he was in the cut and had possession of the gun, his vague and contradictory story of how the revolver somehow fired twice and ended up shooting Anderson was questionable at best. And the only evidence that Winston gained possession of the gun and shot Anderson was Robinson's self-serving testimony. Thus, Robinson has not shown that, but for counsel's

failure to request a charge on reckless conduct, there is a reasonable probability that the result of the trial would have been different. See *Haufler v. State*, 315 Ga. 712, 718 (2023) ("Pretermitting whether there was slight evidence warranting an instruction on either felony or misdemeanor involuntary manslaughter, the evidence of Haufler's guilt for the crimes of which he was convicted was substantial, and it is therefore highly probable that the failure to charge on involuntary manslaughter did not contribute to the jury's verdict."). Thus, this claim of ineffective assistance fails.

(ii) *Pointing a Pistol at Another*

Robinson argues that the charge of pointing a pistol at another was warranted because, to shoot Anderson, the gun was necessarily pointed at him, and there was no evidence that Anderson was aware that the gun was pointed at him. We disagree. The evidence presented at trial showed either that Robinson intentionally fired at Winston and Anderson after telling them, "[Y]a'll get running before I start shooting," which constitutes the crime of aggravated assault, or that Robinson handed the gun to Winston without the intent to

shoot anyone, and Winston then pulled the trigger, meaning that Robinson did not commit an aggravated assault at all. Because, short of the completed act of aggravated assault, there was no evidence that Robinson "intentionally and without legal justification point[ed] or aim[ed] a gun or pistol" at Winston or Anderson, OCGA § 16-11-102, Robinson was not entitled to a jury charge on pointing a pistol at another. See *Stepp-McCommons v. State*, 309 Ga. 400, 403 (2020) ("[W]here the evidence shows either the commission of the completed offense as charged, or the commission of no offense, the trial court is not required to charge the jury on a lesser included offense." (cleaned up)). And trial counsel cannot be deficient in failing to request a charge that was not adjusted to the evidence presented. See *Chambliss*, 318 Ga. at 168; *Moulder*, 317 Ga. at 52 n.14.

(c) Robinson also asserts that trial counsel failed to object to comments in the prosecutor's closing argument that Robinson alleges reduced the State's burden of proof. In making this claim, Robinson relies on *Debelbot v. State*, 308 Ga. 165 (2020), and points

to the following portion of the prosecutor's closing argument:

> Reasonable doubt is the doubt of an impartial, fair-minded juror honestly seeking the truth. I want you to find the truth. The truth is right there for you. The truth is sitting there right in front of you. It's in all of this (indicating). It's in all of his lies. It's in what [Winston] told you. It's what the evidence shows you. To try and figure out what reasonable doubt is – if you know it in your head and you feel it in your heart and you know it in your gut that he did this, then you do not have a reasonable doubt. If you know he did it, find him guilty – cause that's the only thing you can do.

> *Please do not say we just didn't have enough evidence. We know he did it, but. Uh-uh.* The beginning part of that, we know he did it, if you know he did it, that's the evidence telling you that he did it. (Emphasis supplied.)

Specifically, Robinson argues that by telling the jury to find him guilty even though there may not have been "enough evidence" improperly reduced the State's burden of proof.

At the motion for new trial hearing, when asked, "[I]f there had been any argument by the prosecutor that would've attempted to relieve or lessen their burden of proof … would there be a strategic reason for not objecting to that," counsel responded, "No." We conclude, however, after viewing the prosecutor's closing argument

27

in the context in which it was made, that trial counsel did not perform deficiently in failing to object. See *Moulder*, 317 Ga. at 52 n.14.

Prosecutors are generally given wide latitude to rebut closing arguments made by the defense. See *Pyne v. State*, 319 Ga. 776, 782 (2024). Here, when viewed in context, it is clear that the prosecutor was responding to Robinson's closing argument that the State had failed to produce certain evidence of his guilt:

> But what you know is [the officer] said he combed the whole path, the whole way he was chasing [Robinson]. He combed it at daytime. All you heard from [the detective] is they sent a K-9. How far off in there did y'all actually go look? That – that's evidence that didn't come to you because they closed their case before they even knew the whole story."
>
> ...
>
> You've got nothing really you can put your hand on definitive to say who actually fired that gun that killed that little boy. The only thing you have concrete really is that GSR report. And they can't … suggest anything to you to say it's not to receive that. Why … what can they say to tell you, don't believe that the GSR report is not true? They made suggestions. He may have washed his hands. He may have fell in the mud and rubbed it off of him. Those are just suggestions that the State made to witnesses during their testimony. None of those witnesses came in here and said that. Not one of them until she

suggested it to them.

> ...
>
> And when you get those instructions, … it's going to say lack of evidence. That's something that you consider, too, lack of evidence. What the police didn't do, what they didn't bring to you. They lacked photos of this area so you could actually see what this area looks like. Gunshot test, residue test on [Winston].

And immediately after the portion Robinson now challenges, the prosecutor continued:

> Would I have loved to give you that gun? Absolutely. Absolutely. Would I have loved to … give you fifteen eyewitnesses? Absolutely. But the evidence before you is the evidence that we have. And the evidence is enough to find him guilty. And again, not because I say so, but because the evidence compels you to do that.

This argument did not shift or reduce the State's burden of proof. Rather, the prosecutor directly responded to defense counsel's argument that the jury should focus on the absence of evidence produced by law enforcement and asked the jury to instead focus on the evidence that the State did bring forward. And the prosecutor properly urged the jury to find that there was no reasonable doubt that Robinson committed the crimes, consistent with the court's

charges on reasonable doubt,[12] and without using specific percentages to quantify the State's burden of proof. Cf. *Debelbot*, 308 Ga. at 167 (concluding that the prosecutor's argument that proof beyond a reasonable doubt requires something less than 51 percent certainty was obviously wrong and that, under the particular circumstances of that entirely circumstantial case, the failure to object was uniquely harmful).

Accordingly, Robinson has failed to show that his counsel acted deficiently in failing to object to the prosecutor's closing argument. See *Burke v. State*, 320 Ga. 706, 711 (2025) ("To determine whether an argument crosses the line from permissible rebuttal or explanation of the evidence to the improper placement of a burden of proving some fact on the defendant, we look to the prosecutor's argument as a whole, as well as the charge given to the jury on the

---

[12] The trial court charged the jury:

A reasonable doubt means just what it says. A reasonable doubt is a doubt of a fair-minded, impartial juror honestly seeking the truth. A reasonable doubt is a doubt based upon common sense and reason. It does not mean a vague or arbitrary doubt but it is a doubt for which a reason can be given, arising from a consideration of the evidence, a lack of evidence, or a conflict in the evidence.

burden of proof."); *Thompson v. State*, 318 Ga. 760, 768 (2024) ("Viewed in context, the prosecutor was simply highlighting that Appellant's theory of the case – that someone other than Appellant was the fourth attacker – was illogical based on the evidence" and "did not improperly shift the burden to Appellant to prove his innocence."); *Scott v. State*, 317 Ga. 218, 225 (2023) (limiting application of *Debelbot* to its specific set of circumstances).

4. Lastly, Robinson argues that the cumulative prejudice from the combined errors he has identified requires a new trial. Although we have presumed two errors – that trial counsel failed to seek charges on unlawful act involuntary manslaughter and the lesser offense of reckless conduct in Divisions 3(a) and (3)(b)(i) – these two claims failed for similar reasons, i.e., that Robinson failed to show prejudice from the presumed errors because the evidence of his guilt was strong and the evidence supporting these charges was weak. Considering these errors together, we discern no cumulative prejudice on this record that would require a new trial.

*Judgment affirmed. All the Justices concur.*

31